THE STATE, Respondent, vs. McFETRIDGE and others, Appellants.

*September 8, 1892 — April 11, 1893.*

84 473
84 536
84 540
84 473
88 40

84 473
s20 LRA 223
30 LRA 393n
52 LRA 126n

*State treasurer: Ownership of public funds: Liability for interest received on deposits in bank: Official bond.*

1. Under the statutes prescribing the rights, duties, and liabilities of the state treasurer (secs. 152–154, 157, 159, 4419, R. S.), the legal title to public moneys coming into his hands is not in him, but in the state.

2. The deposit of public moneys in banks by the state treasurer in the name of his office, payable at any time, but only upon his official draft, was not unlawful; nor was it unlawful for him to stipulate for and receive interest on such deposits.

3. Such deposits, having been made in accordance with long-continued usage and for convenience in the transaction of the business of his department, were not made for the "gain, profit, or advantage" of the treasurer, within the meaning of sec. 4419, R. S. (which provides that such a deposit by a public officer for his own gain, profit, or advantage, without special authority, shall be *prima facie* evidence of embezzlement), although the treasurer intended to retain to his own use any interest paid thereon.

4. Under sec. 152, R. S. (providing that the treasurer shall receive and have charge of all money paid into the treasury, and shall pay out the same· as directed by law), and sec. 4419 (providing that "every public officer shall promptly pay over as required by law *the same moneys* received and held by him by virtue of his office"), the treasurer is only required to pay out money having the same value and essential qualities as that paid into the treasury.

5. Certificates of deposit or other vouchers for money deposited in solvent banks, payable on demand, are "money," within the meaning of sec. 159, R. S. (which requires the governor and attorney general from time to time to see that all the money belonging to the several funds is in the vaults of the treasury, etc.).

6. Deposits of public funds by the treasurer in banks, subject to draft at any time, are not "investments" of such funds within the meaning of secs. 160, 258, S. & B. Ann. Stats., prohibiting investments of the funds except as therein authorized.

7. If the treasurer was absolutely liable to the state on his official bond for all moneys of the state which came to his hands by virtue of

his office, such liability does not estop the state to maintain that interest received by him on funds deposited in banks was received by virtue of his office and belongs to his office.

8. Such interest was an accretion or increment to the fund, and became part of it, and belongs to the state, the owner of the fund. The intention of the banks or of the treasurer that he should retain the interest as his own, and their belief that he was entitled thereto, cannot affect its ownership or its character as a part of the public funds. It was received by the treasurer by virtue of his office, and his failure to account therefor is a breach of his official bond.

9. In 1876 the state treasurer (then serving his second term) stated to the senate that during his first term he had received a certain sum as interest on deposits of state funds, and claimed the right to retain it as his own money. Afterwards the legislature enacted ch. 341, Laws of 1876, fixing the salary of the treasurer and providing that such salary should be "in full for all services rendered by him in his official capacity;" also that "all fees and *perquisites* received by him from every source shall be paid into the state treasury and become a part of the general fund." Said act provided that it should take effect in 1878, at the expiration of the second term of the then treasurer. These provisions were re-enacted in the R. S. of 1878, but the words "and perquisites" were omitted. *Held*, that such omission has no significance when applied to the retention of interest by the treasurers after 1878. The provision that the salary shall be in full for all services, etc., cuts off all fees and perquisites.

10. General knowledge of the custom of treasurers to retain to their own use interest upon deposits of state funds, and acquiescence therein by the state authorities for many years, could not make it a valid custom.

11. In an action against a treasurer and the sureties on his official bond to recover the amount of interest so received by him and not accounted for, interest may be recovered on said amount from the expiration of his term of office.

APPEAL from the Circuit Court for *Dane* County.

This action is upon the official bond of the defendant *Edward C. McFetridge*, as state treasurer, during the term commencing on the first Monday in January, 1885, and ending on the first Monday in January, 1887, to which office he was duly elected at the general election in November, 1884. It is brought against him and all the sur-

viving sureties in such bond, eleven in number. Three of the sureties deceased before the commencement of the action. The bond is in the penal sum of $500,000, and the condition thereof (omitting formal recitals) is as follows: "Now, therefore, if the said *Edward C. McFetridge* shall faithfully discharge the duties of the said office of state treasurer, and also his duties as a member of the board of commissioners of the public lands, and in the investment of the funds arising therefrom, and if all persons appointed or employed by him in his said office shall faithfully perform their duties and trusts therein, and if the said *Edward C. McFetridge* shall deliver over to his successor in office, or to any other person authorized by law to receive the same, all moneys, books, records, papers, and other articles and effects belonging to his said office, then this obligation to be void, otherwise to be and remain in full force and effect; and the said bond and obligation hereby entered into is hereby deemed to extend to the faithful execution of the duties of the said office of treasurer until his successor shall be elected and fully qualified."

It is alleged in the complaint that during said term the defendant *Edward C. McFetridge*, the principal in said bond, loaned to or deposited with certain banks, banking corporations, and banking firms large sums of the public funds which came to his hands as such treasurer, and received from such banks, corporations, and firms, as a consideration for such loans or deposits, and as interest thereon, large sums of money. The failure of said treasurer to account for or pay over such interest money to the persons entitled thereto, or to his successor in office, is alleged as a breach of the condition of the bond. A further breach thereof is assigned in respect to the alleged failure of Treasurer *McFetridge* to perform his duties as one of the commissioners of the public lands in the investment of the trust funds in the treasury.

The defendant *Edward C. McFetridge* answered separately, as did the defendant *James A. McFetridge*, one of the sureties.    The other sureties answered jointly.    It is substantially admitted in each answer that the treasurer did deposit the public funds in banks, and in his answer it is admitted that he received some pecuniary gains, compensation, or percentage from some of said banks, in consideration of the incidental benefits accruing to them from such deposits.    It is alleged in each answer that the making of such deposits was unauthorized by law.

A trial of the action in the circuit court resulted in findings of fact to the effect that, during his said official term, the defendant *Edward C. McFetridge*, the principal in the bond in suit, loaned to, and placed and kept on deposit with, divers banks and banking associations and firms, from time to time, a large portion of the funds and public money of the state which came to his hands as state treasurer, with the agreement or understanding that such banks, associations, and firms "should pay, as compensation for such loans or deposits, a percentage or interest upon the average amount of such loans or deposits, at certain rates for certain fixed periods, at certain definite times;" that said *Edward C. McFetridge*, during his said term, received of such banks, associations, and firms $44,217.83 as interest upon the funds and public money in his hands belonging to the state, thus deposited, which sum he failed to account for as public money of the state, or to pay the same over to his successor in office.

As conclusions of law the court found that the money thus received by the treasurer as interest on the public funds thus loaned or deposited became accessory to and a part of those funds; that such funds, thus increased by the interest paid thereon, belonged to the state, and not to the treasurer; and that Treasurer *McFetridge*, having failed to charge the same to himself in his account with the state, or to pay

the same over to his successor in office or other person lawfully entitled thereto, is, and the sureties in his official bond are, liable in this action for the amount thus paid the treasurer as interest and unaccounted for, together with interest thereon from the first Monday in January, 1887, at which date he surrendered his office to his successor. There is no controversy concerning the amount thus received by the treasurer from the banking institutions in which he made the deposits.

The circuit court refused to find, as requested by the defendants, that none of the sureties (with a single exception) knew that the treasurer deposited the public funds with such banks and banking institutions, or that he received interest thereon, and never consented that he might do so; that such acts were unlawful, and such depositing of the public funds by the treasurer for his own gain and profit is *prima facie* evidence of embezzlement of such funds by him, and that the sureties are not liable on his official bond for money thus obtained by him by such unlawful use of the public funds in his hands as treasurer.

Judgment was thereupon entered for the state against all the defendants for $44,217.83, and interest thereon from the first Monday in January, 1887, being $15,906.14,— amounting in all to $60,123.97,— and for costs. The circuit judge filed a written opinion in the case, which will be found in a note hereto.[1]

All the defendants join in an appeal from the judgment.

*Joshua Stark*, attorney, and *David S. Ordway*, of counsel, for the appellants, contended, *inter alia*, that the find-

---

[1] The following opinion in this case, and in the case of *State v. Harshaw*, which was tried with it, was filed by Judge A. W. NEWMAN, of the sixth judicial circuit, before whom those cases were tried:

"These are two actions against former state treasurers and their sureties to recover money which the treasurers received from certain banks, for the use of public money deposited with them, and which they have failed to deliver to their successors in office. The two cases depend

The State vs. McFetridge and others.

ing of the trial court that the defendant *McFetridge* loaned public moneys to banks was not warranted. The deposits were not loans. There is a well recognized distinction between a general deposit in a bank subject to check, and a loan. Lewin, Trusts, 295; *Estate of Law*, 14 L. R. A. 103, and cases cited in opinion and note; *People ex rel. Nash v. Faulkner*, 107 N. Y. 489; *Barney v. Saunders*, 16 How.

mainly on similar facts, and the questions of law are very much the same, so they were tried and are decided together for convenience.

"*Mr. McFetridge* was treasurer for five years, from 1882 to 1887; *Mr. Harshaw* from 1887 to 1891,— four years. During these terms of office the law fixed the salary of the office at $5,000 per year, and at the same time declared that that sum 'shall be in full for all services rendered by him in his official capacity.' This sum is equal to the largest salary paid to any officer in the state. It is equal to the salary paid to the governor and to the justices of the supreme court. The duties of the office of the state treasurer require from him little besides good bookkeeping and suitable care to keep the public money safely. He is not in any important sense the state financier. The general management of the finances of the state is confided to three commissioners, of whom the treasurer is one. These defendants, during their respective terms, kept large sums of the public money deposited in banks, and received from the banks, for the use of it, large sums of money, several times larger than the salary allowed to their office by law. This interest money they did not account for to the state nor deliver to their successors in office, but kept as their own. The evidence tends to show that earlier treasurers had uniformly done the same, but with much less of system and smaller profit. It is to recover these interest moneys that these actions are brought.

"It may be assumed, for the purposes of the decision, that these interest moneys belong to whichever party shall be found to have been the owner of the fund which earned them. This is the general rule of law, and no circumstances seem to make this case exceptional. Indeed, it is understood that there was no dissent from this proposition on the argument. Interest upon a fund is accessory to the fund and becomes a part of it. The fund, as so increased by interest, belongs to the owner of the original fund.

"In this action it is claimed for the state that the principal fund, which earned this interest, was the money of the state. On the ground that the interest was an accretion to that fund, the state claims to recover it

The State vs. McFetridge and others.

545-6; *Payne v. Gardiner*, 29 N. Y. 167. The payments of money to defendant *McFetridge* by reason or on account of such deposits were gratuitous and voluntary, and were made to him individually and for his own personal use, and not to him officially for the use of the state. At no time could an action have been maintained by him for the recovery of interest, so-called, or other compensation from

in this action. For the defendants it is denied that the principal fund was the money of the state; but, on the contrary, it is claimed that it was the treasurer's own money, and that for that reason he has the right to retain the interest which it earned. So the issue is, practically, Whose money was it that earned the interest? The decision will be a necessary consequence from the answer to this question.

"It seems to be fair to assume that money which is received into the state treasury is the state's money, until in some way it is satisfactorily shown or demonstrated that it is not the state's money. The argument by which this is said to be demonstrated is this: The treasurer gives a bond, with sureties, for the faithful discharge of the duties of his office. Upon this bond he and his sureties are liable to the state in the amount of the penalty of his bond, to account for and pay over all the moneys which shall come to his hands by virtue of his office, absolutely and in every event. That in no event whatever can he be excused from such payment. Hence it is inferred that he at once, upon the execution of his official bond, becomes an absolute debtor to the state in the amount of the penalty of his bond. From the fact that he is so an absolute debtor it is again inferred that moneys which are received into the state treasury become the treasurer's own money, and that his bond stands to the state in place of the money. This is also said to follow logically from the premises that he is an absolute debtor on his official bond. The ownership of the fund and the liability are said to be coextensive.

"The whole argument rests upon the premises that the treasurer is liable in every event. If in any circumstance of loss he is not liable, the argument fails. No case has been found where it has been held that the treasurer is liable when the money has been lost without his fault, by act of God or of the public enemy. The only case where the question was involved is *U. S. v. Thomas*, 15 Wall. 337. In that case it is held that for such a loss he is not liable. In that event he is excused for losing the public money. It would be no excuse for not paying over that he had lost his own money by whatever means. This makes the responsibility of the custodian of public funds the same as the common-law

the banks: (1) For want of a contract in that behalf; and (2) because any contract for the payment of interest to him individually, or to him as state treasurer, would have been illegal, contrary to public policy, and therefore void. *Ring v. Devlin*, 68 Wis. 384, 389. No action could have been maintained by the state against the banks for the recovery of interest upon such deposits: (1) For want of any agree-

---

responsibility of the common carrier. He also is excused for loss by the act of God or of the public enemy. It has not been claimed that the common carrier, by reason of his strict responsibility, becomes the owner of the goods he carries.

"This is an open question in this state. It is to be decided according to what shall appear to be the better reason. It does not seem that public policy shall require a state treasurer who keeps the public funds faithfully in the place designated by law shall be held liable for public money lost without his fault, by the act of God or the public enemy; for example, by an earthquake which should engulf the capitol, or by an invading army which should capture it. But there are many decided cases in which the judges assume and say that the treasurer is an absolute debtor, and, as a corollary, that the money is his own. This conclusion does not seem to be a necessary inference from the premises, and is denied in some of the cases where the absolute liability is assumed, as in *Hennepin Co. v. Jones*, 18 Minn. 199; but these cases are mostly, if not all, involving the liability of town, county, or local treasurers, or collectors of public money, and for that reason are not strictly in point in this case, for ordinarily the statutes relating to the management and preservation of the public funds by the state treasurers and the local treasurers are different. Usually, in the case of the local treasurers, nothing is designated with respect to the mode or place of keeping the funds, so that if he accounts fairly, and meets all obligations as presented, there is usually no occasion or disposition to inquire further as to the disposition or management of the funds; while in the case of the state treasurers the statutes are more explicit. It is contemplated that all public funds of the state shall remain specifically in the vaults of the treasury, so that they can be counted quarter yearly.

"So the state treasurer does not stand on the same footing as the local treasurer. In the case of the local treasurer, inasmuch as the law does not direct the mode and place of keeping the funds, the treasurer, it is assumed, may keep them where and very much as he pleases. It is very much the same as if the funds were his own. But in the case of

ment in that behalf between the banks and the state; (2) because any such agreement, if it had been made by the treasurer on behalf of the state, would have been a violation of law and therefore void, and the state, in order to maintain an action upon it, must ratify it, and this could only be done by legislative act. *State v. Keim*, 8 Neb. 63; *State v. Delafield*, 8 Paige, 527, 542; *State v. Buttles*, 3

the state treasurer the statutes provide industriously for the safe keeping of the funds in a designated place, where they are to some extent under the supervision of other officers than himself.

"The recent case of *Comm. v. Godshaw*, 17 S. W. Rep. 737, decided by the court of appeals of Kentucky, goes upon this distinction. This case holds that a local collector, called the 'trustee of the jury fund,' whose duty it was to collect fines and forfeitures and other sources of revenue, to be applied to the payment of the jurors, was the owner of the money he collected, upon the ground that no law directed a place for depositing or mode of keeping it. It was held that the interest paid to him by a bank where he deposited the funds could not be recovered from him by the state; but the court say that this would not be so if the law prescribed a mode of keeping or a place of depositing it. The court say : 'Nothing is prescribed as to the mode of keeping it or the place of depositing it. Money paid into the treasury becomes the money of the state because it is required to be paid into the treasury as such; and, the law requiring the money to be paid into certain banks, when the treasurer does this, and the money is lost, he is not accountable unless by his neglect.' The court cites *Perley v. Muskegon Co.* 32 Mich. 132, as an authority to the same effect. So, if it shall be found, on an examination of the statutes, that by law the state treasurer is required to keep the state's moneys in the vaults which the state has provided for that purpose at the capitol, where it can be counted periodically, and has forbidden him to loan it, then these cases are authority that the money is not the treasurer's own money, but that it is the state's own money; and that the treasurer's relation to it is strictly that of a bailee; and that if he obeys the law relating to its custody, and it becomes lost without his fault, he is not liable.

"The condition of the treasurer's bond is for 'the faithful discharge of the duties of his office.' The general duties of his office are defined by section 152 of the Revised Statutes: 'The treasurer shall keep his office at the capitol, shall receive and have charge of all moneys paid into the state treasury, and shall pay out the same as directed by law.' The lan-

The State vs. McFetridge and others.

Ohio St. 309. It is equally clear that this action against the treasurer to recover moneys obtained as the fruit of a criminal violation of law cannot be maintained without ratification of his unlawful act. The only remedy of the state, if any, against the banks without such ratification would be, not upon contract, but by bill in equity to reach the funds converted by deposit, and damages for

guage is plain and unambiguous. It does not admit of interpretation. *Ogden v. Glidden,* 9 Wis. 47. It is to be understood according to the common and approved usage of the language. Sec. 4971, R. S. 'He shall have charge of the moneys' seems equivalent to saying, 'He shall have custody of the money.' The governor and attorney general are required, at least once in each quarter year, to examine and see that all the money appearing by the books of the secretary and state treasurer as belonging to the several funds is in the vaults of the treasury. If it is not found to be there it must be put there within ten days, or the attorney general must bring an action to recover it. Sec. 159. This also is plain and unambiguous. It is objected that the word 'treasury' may be ambiguous; that it does not always mean the place where the money is kept, but that it sometimes' signifies merely the custody of the officer. But the phrase 'vaults of the treasury' is not obnoxious to that objection. It is required that they examine and see that 'all the money' which ought to be there is there in the vaults of the treasury. Sometimes the term 'money' is ambiguous. In some connections it is held to include some things which strictly are not money; but as used in this statute, it will hardly be claimed that its meaning is doubtful. It will not be held that in this statute the word 'money' includes promissory notes, checks, or certificates of deposit, or perhaps anything which is not commonly understood to be money. These are only evidences of debt. It makes no difference that they are issued by a bank.

"In law there can be no difference between a loan to a bank and a loan to anyone else. There is no law which presumes one borrower without security is safer than another. *Cedar Co. v. Jenal,* 14 Neb. 254; *Wayne Co. v. Bressler,* 32 Neb. 818; *Perley v. Muskegon Co.* 32 Mich. 132. The law makes the depositing of public moneys by any of the officers named in sec. 4418, which includes the state treasurer, 'for his own gain, profit, or advantage, without special authority,' *prima facie* evidence that such officers have embezzled the money. Sec. 4419. This is a clear intimation, at least, that it was not intended that the state treasurer should make profit for himself by the use of public money.

The State vs. McFetridge and others.

their conversion. *First Nat. Bank v. Gandy*, 11 Neb. 431; *Union Stock Yards Bank v. Gillespie*, 137 U. S. 411; *Perley v. Muskegon Co.* 32 Mich. 132. Such right of action ceased when the entire amount of the funds deposited was duly applied by the treasurer to the public use, or turned over to his successor in office. *State v. Mills*, 55 Wis. 229; *State v. Baetz*, 44 id. 624.

Sec. 4419 also provides that 'every public officer shall promptly pay over, as required by law, the same moneys received and held by him by virtue of his office, and the whole thereof.' It is objected that this statute is ambiguous; that the phrase ' the same moneys' may, and probably does, mean 'the same amount of moneys.' But it will be seen that all that is significant in the idea that it is the same amount of moneys which is to be paid remains in the statute if the word 'same' is entirely omitted from it. It will still direct that he 'shall pay over the same moneys received and held by him by virtue of his office, and the whole thereof.' To say that he shall pay over all — the whole amount of — moneys received and held by him is very much the same as to say that he shall pay over the same amount of moneys received by him. The vice of the proposed interpretation is that it gives no force to the word 'same.'

" A statute ought, upon the whole, to be so construed that, if possible, no clause, sentence, or word shall be superfluous, insignificant, or void. Every clause and word of a statute shall be presumed to have been intended to have some force and effect. *Harrington v. Smith*, 28 Wis. 43, 67. This provision is part of a penal statute, and perhaps, on the familiar rule, is to be strictly construed. Yet the intention of the legislature must govern in the construction of penal as well as other statutes, and they are not to be construed so strictly as to defeat the obvious intention of the legislature. *U. S. v. Lacher*, 134 U. S. 624. It seems to be written in these statutes, with sufficient clearness to be understood by the common mind, that the state treasurer is to receive all the money paid into the state treasury, and to take care of it; that he is to keep it specifically 'in the vaults of the treasury' provided by the state in connection with his office in the capitol; that the money is to be counted in the vaults of the treasury by the governor and attorney general quarter yearly; that he is to pay out the same money received by him, but only upon the warrant of the secretary of state. His whole dealing with it is official, specific, and not at all as if he was the owner. It is all inconsistent with the idea that the legislature contemplated that, as against the state, it was the state treasurer's money. In contemplation of law, the treasurer

The "moneys belonging to the treasurer's office," referred to in the bond, are those moneys only which the treasurer was by statute required to receive and have in charge and pay out according to law. They did not include the moneys voluntarily paid by the banks to the treasurer individually. The liability of a surety is restricted to the express terms and the necessary import of

is simply the custodian of the state's money. It is strictly a bailment. *Comm. v. Godshaw*, 17 S. W. Rep. 737; *Perley v. Muskegon Co.* 32 Mich. 132; *U. S. v. Thomas*, 15 Wall. 337. No decision to the contrary is known where there were statutes directing the mode of keeping the funds.

"But it is objected that the state cannot recover this interest because it must trace its title to it, if at all, through a series of unlawful transactions. If it is established that the principal fund which earned the interest was the property of the state, this objection does not seem to be insuperable. The depositing of the money in banks by the treasurer for his own gain was forbidden and unlawful. On its civil side at least the unlawful act was a tort,— a conversion of the state's money. The conversion did not displace the state's title. The fund was still the state's money. The accessory followed its principal; the accretion was the state's money. *U. S. v. Mosby*, 133 U. S. 276-286. But the treasurer can trace title to the interest only through his own wrongful act. This he cannot be allowed to do. That would be a violation of that most ancient and widely applied maxim of the law, 'No man shall profit by his own wrong.' The defendant has not even plausible claim of legal title to this interest. It would, indeed, be a startling legal paradox if the treasurer, being forbidden by law to deposit the public funds for his own gain, could yet do the very thing forbidden, and get away with his gains according to law. This interest was also received into the state treasury. It was paid to the treasurer without restriction. There was no way for the banks to pay the money into the treasury but to put it into the hands of the treasurer. Any subtle distinction between paying to the treasurer and paying into the treasury is specious and illusive. It is not certain that any of this money came into the vaults of the treasury. No money is paid into the vaults of the treasury. It is paid to the treasurer. It is then, in legal contemplation, in the treasury. *People v. McKinney*, 10 Mich. 54. It is then the treasurer's duty to put it into the vaults. Whether he do so does not affect the ownership of the money. It is the treasurer's duty to deliver to his successor in office all moneys, books, records, papers, furniture, and other effects belonging to or preserved in

his undertaking. *Miller v. Stewart,* 9 Wheat. 681; *People v. Chalmers,* 60 N. Y. 154; Brandt, Suretyship, § 59; *Kingsbury v. Westfall,* 61 N. Y. 356; *Lang v. Pike,* 27 Ohio St. 498; De Colyar, Guar. 233; *Vivian v. Otis,* 24 Wis. 518. Such express terms of an official bond are themselves limited by the statutes prescribing the duties of the officer. *Nolley v. Callaway Co. Court,* 11 Mo. 447; *People v. Pennock,* 60 N. Y. 421; *Orman v. Pueblo,* 8 Col. 292; Brandt, Suretyship, 451; *Gaussen v. U. S.* 97 U. S. 584; *Furlong v. State,* 58 Miss. 717; *Carey v. State ex rel. Farley,* 34 Ind. 105; *State ex rel. Arnold v. Givan,* 45 id. 267. A distinction is noted between acts *virtute officii* and acts *colore officii,* the surety being liable only for the former. *Gerber v. Ackley,* 37 Wis. 43; *Taylor v. Parker,* 43 id. 78; *Barnes v. Whitaker,* 45 id. 204; *State ex rel. Allen v. Conover,* 28 N. J. Law, 224; *State v. Medary,* 17 Ohio, 554; *Eaton v. Kelly,* 72 N. C. 110; *Leigh v. Taylor,* 7 Barn. & C. 491; *Frost v. Mixsell,* 38 N. J. Eq. 586. The loan or deposit of the funds of the state by the treasurer

his office. Sec. 157, subd. 6. These interest moneys belong to his office. He has not faithfully discharged the duties of his office until he has delivered them to his successor in office.

"It is not considered that a long-continued practice of state treasurers to deposit public money in banks for their own gain is such a practical construction of the statute by officers charged with the execution of the law, as to be of any controlling influence. It is only in case of real doubt that construction is allowable. Whether the law contemplated that the treasurer might deposit public moneys in banks for his own gain is not perceived to have been doubtful since ch. 340, Laws of 1876, came in force, however it may have been before. Nor is it considered that the delay of the state to claim this money acts in any way as a bar to its right or a cloud upon its good faith. The law is the standard of the treasurer's duty, and the measure of his right. It all the while warned him that this was not his money.

"Judgment should be for the state for the amount of moneys detained by the treasurers, with interest from the time when it should have been paid to their successors."

to or with banks or bankers, upon interest or otherwise, unless such funds in bank subject to instant check be deemed to be in the treasury (as now declared by statute), was not only unauthorized, but was punished by statute as a crime. Const. art. VIII, sec. 2; R. S. secs. 151, 152, 160, 258, 258a, 4419, 4549, 4550; *State ex rel. Bell v. Harshaw,* 76 Wis. 230. It may be that the general deposit of moneys for the state in banks was a conversion thereof, but the defendant treasurer having fully accounted for and delivered over all state moneys of which the statute made him custodian, it does not appear that the state has sustained any loss or damage by reason of his violation of law and duty in making such deposits. *State v. Baetz,* 44 Wis. 624; *State v. Mills,* 55 id. 229; *Renfroe v. Colquitt,* 74 Ga. 618; *State ex rel. Logansport Nat. Bank v. Kent,* 53 Ind. 112.

The moneys in dispute were not moneys belonging to the treasurer's office within the meaning of his official bond, because by the statute and the terms of his bond the treasurer was made insurer of the funds committed to his charge; and the responsibility of himself and his sureties should be restricted to the moneys of which the statutes which required the bond made him custodian. The rule of responsibility applied to officers charged with the collection, care, and disbursement of public funds, holds them, upon grounds of public policy, absolutely liable according to the terms and strict tenor of their official bonds. *U. S. v. Prescott,* 3 How. 578; *U. S. v. Morgan,* 11 id. 154; *S. C.* 67 Am. Dec. 365–373, note; *U. S. v. Dashiel,* 4 Wall. 182; *U. S. v. Keehler,* 9 id. 83; *Boyden v. U. S.* 13 id. 17; *Bevans v. U. S.* id. 56; *U. S. v. Thomas,* 15 id. 337; *Comm. v. Comly,* 3 Pa. St. 372; *New Providence v. McEachron,* 33 N. J. Law, 339; *State ex rel. Township v. Powell,* 67 Mo. 395; *State ex rel. Miss. Co. v. Moore,* 74 id. 413; *Union Tp. v. Smith,* 39 Iowa, 9; *Lowry v. Polk Co.* 51 id. 50; *Wilson v. Wichita Co.* 67 Tex. 647; *Boggs v. State,* 46

id. 10; *State ex rel. Bladen Co. v. Clarke*, 73 N. C. 255; *Jefferson Co. v. Lineberger*, 3 Mont. 235; *State v. Jaynes*, 19 Neb. 162; *U. S. v. Watts*, 1 N. M. 553; *State v. Harper*, 6 Ohio St. 610; *Omro v. Kaime*, 39 Wis. 468. In some of the states the courts have deduced from the doctrine of absolute liability the further proposition that the treasurer or other public officer who has given bond with sureties to account for and pay over public funds officially received by him, is not only thereby made, in effect, debtor for such funds, but is invested with title to the same. *Muzzy v. Shattuck*, 1 Denio, 233; *Colerain v. Bell*, 9 Met. 499; *Hancock v. Hazzard*, 12 Cush. 112; *Egremont v. Benjamin*, 125 Mass. 19; *Halbert v. State ex rel. Martin Co.* 22 Ind. 125; *Morbeck v. State ex rel. Jackson Tp.* 28 id. 86; *Inglis v. State ex rel. Hughes*, 61 id. 212; *Bocard v. State ex rel. Stevens*, 79 id. 270; *Rock v. Stinger*, 36 id. 346; *Shelton v. State ex rel. Morgan Co.* 53 id. 331. The defendant *McFetridge* was not bound by the statutes to keep in the vaults of the treasury and pay out only the identical moneys (coin and bills) received into the treasury. Moneys in bank subject to the check of the treasurer and therefore at his immediate command were, in a practical and generally recognized sense, "in the treasury." *Beck v. McGillis*, 9 Barb. 35; *Vaisey v. Reynolds*, 5 Russ. 12; *Parker v. Marchant*, 1 Phillips, 356; *Mann v. Mann*, 1 Johns. Ch. 231; 2 Am. & Eng. Ency. of Law, 94, note. The treasurer and his sureties being absolutely liable as insurers for the safe-keeping and delivery of all moneys belonging to his office, their liability must be strictly limited to those moneys, and does not embrace the moneys here in question. *Renfroe v. Colquitt*, 74 Ga. 618; *Comm. v. Godshaw*, 17 S. W. Rep. (Ky.), 737; *People v. Walsen*, 17 Col. 170.

The construction of the statutes and bond of the treasurer now contended for by appellants was recognized and accepted in theory and practice by all those charged with

The State vs. McFetridge and others.

the making and the execution of the laws and the administration of the government of the state in all its departments for more than thirty years preceding 1890. The omission in the Revised Statutes of 1878 of the words "and perquisites" contained in ch. 341, Laws of 1876, repealed the only provision of statute which could possibly be deemed to direct the disposition of the interest on deposits; and the intention was clearly to restore the situation as it had been before 1876. "Fees" and "perquisites" are not equivalent terms. *Williams v. State,* 2 Sneed, 162; Century Dict. The interest received by the treasurer upon the deposits was clearly a perquisite. See *Hughes v. People,* 82 Ill. 78; BRAMWELL, L. J., in *Att'y Gen. v. Lamplough,* 3 Exch. Div. 214; Endlich, Interp. Stats. sec. 49; *Bank of Sav. v. Collector,* 3 Wall. 495; *Ex parte Crow Dog,* 109 U. S. 556. The general understanding of a law and constant practice under it for so long a period by all the officers of government whose duty it has been to execute it, unquestioned by any suit or public or private action to test or settle the construction in the courts, ought to be very strong if not conclusive evidence of its true meaning and application and that they are such as it has thus received. *Scanlan v. Childs,* 33 Wis. 663, 666; *Harrington v. Smith,* 28 id. 43, 68; *U. S. v. Philbrick,* 120 U. S. 52; *People v. Walsen,* 17 Col. 170; Sedgwick, Stat. Const. 255; *Baltimore v. State ex rel. Board,* 15 Md. 376; *Fall v. Hazelrigg,* 45 Ind. 576; *Prigg v. Comm.* 16 Pet. 621.

*David S. Ordway,* as attorney for the sureties, also contended, *inter alia,* that there was no law or statute, at the date of the bond upon which this suit is brought, requiring or even by implication authorizing the loan or deposit by the treasurer of public funds or the receipt by him of interest or gratuity for the use of such moneys. Without such statute it was not and could not be an *official* duty resting upon the treasurer to accumulate or pay into the

treasury either interest or compensation for such use of the public funds. It follows that the sureties cannot be held liable in this action, because it is only the *official* acts of the treasurer which the sureties have by their contract become responsible for. *Bishop v. McGillis*, 80 Wis. 575; *Gerber v. Ackley*, 32 id. 233, 37 id. 43; *State ex rel. Blinebury v. Mann*, 21 id. 684; *Taylor v. Parker*, 43 id. 78; *Barnes v. Whitaker*, 45 id. 205; *State v. Pennock*, 60 N. Y. 421; *Supervisors v. Bates*, 17 id. 242; *Donovan v. Mayor*, 33 id. 291–293; *Ward v. Stahl*, 81 id. 406–409; *McKee v. Griffin*, 66 Ala. 211; *Coleman v. Ormond*, 60 id. 330; *Morrow v. Wood*, 56 id. 1; *U. S. v. White*, 4 Wash. C. C. 414; *U. S. v. Bell*, Gilp. 41; *Saltenberry v. Loucks*, 8 La. Ann. 95; *State v. White*, 10 Rich. Law, 442; *St. Louis v. Sickles' Ex'x*, 52 Mo. 122–127; *Renfroe v. Colquitt*, 74 Ga. 624; *Leigh v. Taylor*, 7 Barn. & C. 491–493; *Lafayette v. James*, 92 Ind. 240–246; *McConnell v. Simpson*, 36 Fed. Rep. 750–752. See note to *Palmer v. St. Albans*, (60 Vt. 427) 6 Am. St. Rep. 130, and cases, 132, 133; *Schloss v. White*, 16 Cal. 65; *Hill v. Kemble*, 9 id. 71; *Governor v. Perrine*, 23 Ala. 807. The difference between an official and an unofficial act is clearly pointed out in the case of *Am. Steamship Co. v. Young*, 89 Pa. St. 192, 193.

The *Attorney General* and *R. M. Bashford*, for the respondent, argued, among other things:

1. The legal title to the funds deposited by the defendant treasurer was at all times in the state as the original owner, and in case of controversy they might have been recovered in the name of the state. *State v. Casey*, 5 Wis. 318; Newmark, Bank Dep. sec. 107. The deposits were in fact, and as a matter of law, loans to the banks. *People ex rel. Mills v. Utica Ins. Co.* 15 Johns. 392; *People v. Commissioners*, 23 N. Y. 244; *Sergeant v. Downey*, 49 Wis. 528; *Shoemaker v. Hinze*, 53 id. 117; *Williams v. Williams*, 55 id. 308; *State v. Keim*, 8 Neb. 67; *Comm.*

*Bank v. Hughes,* 17 Wend. 100; *Southern Loan Co. v. Morris,* 2 Pa. St. 175; *Cent. Nat. Bank v. Conn. Mut. L. Ins. Co.* 104 U. S. 54; Newmark, Bank Dep. secs. 9–12.

2. Independent of any legislative or constitutional provisions, the interest arising from deposits of the public moneys was an accessory to the fund and became a part of it, and the fund so increased by interest belonged to the owner of the original fund. *Earl of Lonsdale v. Church,* 3 Brown, Ch. 40; *Willis v. Commissioners,* 5 East, 21; *Barney v. Saunders,* 16 How. 535, 543; *Docker v. Somes,* 2 Mylne & K. 655; *Mosby v. U. S.* 133 U. S. 273; 1 Perry, Trusts, sec. 468; *Martin v. Raborn,* 42 Ala. 648; *Supervisors v. Wandel,* 6 Lans. 33, 59 N. Y. 645; *Hunt v. State ex rel. Anderson,* 124 Ind. 306.

3. The constitution and laws of this state made provision for investment of the public funds and moneys in the treasury, expressly declaring that every such investment shall be held as part of the fund out of which it is made; and that the loss or gain shall inure thereto. They are therefore trust funds, and all gains arising in any manner or from whatever source become part of the original funds.

4. The treasurer, as one of the commissioners of the public lands, and as the active agent of the board, was charged with the duty of making investment of the public funds in the manner provided by the legislature, and any arrangement for the use of the moneys in his custody for his own personal gain was inconsistent with the faithful performance of his official duty; and he and the sureties upon his bond are therefore liable to account for all the earnings arising from such use of the public funds and moneys of the state. *Gillett v. Gillett,* 9 Wis. 195; *Pickett v. School Dist.* 25 id. 551; *Veeder v. Lima,* 19 id. 280; *Rippe v. Stogdill,* 61 id. 42; *McLeod v. Evans,* 66 id. 406; *Willard v. Comstock,* 58 id. 577; *Haywood v. Lincoln*

*L. Co.* 64 id. 639; *Pittsburg M. Co. v. Spooner*, 74 id. 320; *Cook v. Berlin W. M. Co.* 43 id. 444; *In re Taylor Orphan Asylum*, 36 id. 534, 552; *Benson v. Heathorn*, 1 Younge & C. Ch. 326; *Attorney General v. Earl of Clarendon*, 17 Ves. 491; *Toronto v. Bowes*, 4 Grant (U. C.), 489; *Wormley v. Wormley*, 8 Wheat. 421; *Wardell v. U. P. R. Co.* 103 U. S. 658; *Marsh v. Whitmore*, 21 Wall. 178; *People ex rel. Plugger v. Overyssel Tp.* 11 Mich. 222; *Mayor v. National Broadway Bank*, 126 N. Y. 665.

5. The deposit of the public funds in the banks, under an agreement for the payment of interest therefor, by the state treasurer in his name of office, subject to the official draft of himself or his assistant, the accounting for the same as moneys of the state in his official reports and statements, and the collection by him while state treasurer of the interest moneys paid in consideration of such deposits, were all essential parts of the same transaction,— they were the official acts of the state treasurer. At any rate, the defendants are estopped to deny that such was their character. The banks were charged with the knowledge of the character and ownership of the funds, and with all the responsibility which such knowledge imposed. *Cent. Nat. Bank v. Conn. Mut. L. Ins. Co.* 104 U. S. 54; *Shaw v. Spencer*, 100 Mass. 382. Had the banks or any one of them refused to pay over these moneys upon demand of the treasurer, suit to recover the same might have been brought in the name of the state. *State v. Casey*, 5 Wis. 318; *Cent. Nat. Bank v. Conn. Mut. L. Ins. Co., supra; Bayne v. U. S.* 93 U. S. 642; *Wolffe v. State*, 79 Ala. 201; *Mechanics' Bank v. Hallowell*, 52 Me. 545; *People v. Houghtaling*, 7 Cal. 350; Hill, Trustees, 173; *Lewis v. U. S.* 92 U. S. 618; *Stone v. U. S.* 106 id. 529; *State v. Bevers*, 86 N. C. 588; *School Districts v. Edwards*, 46 Wis. 150; *McLeod v. Evans*, 66 id. 401. In case of actual conversion, the officer and his sureties are held liable on his official

bond for the amount of such moneys with interest at the legal rate from the time of the conversion, and not from the date of demand for an accounting.  *Cassady v.* *Trustees of Schools,* 105 Ill. 560; *Stern v. People,* 102 id. 540; *Cleveland v. Burnham,* 64 Wis. 360; *Clark v. Wilkinson,* 59 id. 553; *Dodge v. Perkins,* 9 Pick. 368; *Wood v. Robbins,* 11 Mass. 506; *Gay v. Gardiner,* 54 Me. 477; *Buzzell v. Snell,* 25 N. H. 474; *Williams v. Sherman,* 7 Wend. 109; *U. S. v. Knowles,* 106 U. S. 537; *U. S. v. Curtiss,* 100 id. 119.    The treasurer violated his duty when he deposited these moneys in banks for his private gain, and his doing so was a conversion of the money to his own use. *Sargeant v. Downey,* 49 Wis. 528.    The character of the act of the state treasurer in depositing the public funds and collecting interest thereon is not different in principle from the collection of an unlawful tax, or of money upon an illegal tax levy by a municipal treasurer.    Having collected the tax, he cannot question the right of the proper authority to receive it, but must pay it over, and upon his failure to do so he and his sureties are liable upon his official bond. *Olean v. King,* 116 N. Y. 362; *Neal v. School Comm'rs,* 27 Md. 241; *Comm. v. Philadelphia,* 27 Pa. St. 497; *Waters v. State,* 1 Gill, 302; *Smyth v. Titcomb,* 31 Me. 272; *People ex rel. Martin v. Brown,* 55 N. Y. 180; *Cairns v. O'Bleness,* 40 Wis. 477; *Remington v. Ward,* 78 id. 539.    The following authorities, in addition to those already referred to under this head, sustain the action upon the bond for the interest, and enforce the obligation against the principal and sureties: *Earl of Lonsdale v. Church,* 3 Brown, Ch. 40; *Supervisors v. Wandel,* 6 Lans. 33; *Hunt v. State ex rel. Anderson,* 124 Ind. 306; *Hughes v. People,* 82 Ill. 78; *Cooper v. People,* 85 id. 417; *Chicago v. Gage,* 95 id. 593.

6. If the collection of interest upon the deposit of the public funds in the banks by the state treasurer was an illegal transaction, the appellants cannot be heard to assert

such a defense to this action. *Evans v. Trenton*, 24 N. J. Law, 764; 2 Kent, Comm. 464; *Cotton v. Thurland*, 5 Term R. 405; *Smith v. Bickmore*, 4 Taunt. 474; *Kiewert v. Rindskopf*, 46 Wis. 481; *Wells v. McGeoch*, 71 id. 196, 235; *Pittsburg M. Co. v. Spooner*, 74 id. 307; *People v. Treadway*, 17 Mich. 480; *People ex rel. La Grange Tp. v. State Treasurer*, 24 Mich. 468; *People v. Tweed*, 5 Hun, 353; *Bullwinkel v. Guttenberg*, 17 Wis. 583; *La Pointe v. Ashland*, 47 id. 251; *Lyndon v. Miller*, 36 Vt. 329; *Trescott v. Moan*, 50 Me. 347; *Casper v. State*, 47 Wis. 535; *Remington v. Ward*, 78 id. 539; *Sutherland v. Carr*, 85 N. Y. 105; *State v. Buttles*, 3 Ohio St. 309; *Barney v. Saunders*, 16 How. 535; *Sharp v. Taylor*, 22 Eng. Ch. 801; *Tenant v. Elliott*, 1 Bos. & P. 3; *Farmer v. Russell*, id. 296; *Campbell v. Donaldson*, 4 Barn. & Ald. 426; *Thomson v. Thomson*, 7 Ves. Jr. 473; *Bridger v. Savage*, 15 Q. B. Div. 363.

7. The proof does not establish any custom or usage as to the payment of interest for the personal gain of the state treasurer, and no such usage or custom can be made available as a defense, as it would be a violation of the plain and positive provisions of the statutes. Endl. Interp. Stats. §§ 358, 361, 528; Sedg. Stat. Const. 29, 38, 227, 231; Dwar. Stat. 475, 477; 1 Greenl. Ev. §§ 292, 293; Lawson, Usages & Cust. 453; *U. S. v. Fisher*, 2 Cranch, 358, 399; *Attorney General v. Mayor of Bristol*, 2 Jac. & W. 321; *Trustees Clyde Nav. v. Laird*, L. R. 8 App. Cas. 673; *Minaghan v. State*, 77 Wis. 648; *Diplock v. Blackburn*, 3 Camp. 43; *Peirce v. U. S.* 1 Ct. Cl. 270; *Albright v. Bedford Co.* 106 Pa. St. 582; *Brown v. Comm.* 2 Rawle, 40; *Godshalk v. Northampton Co.* 71 Pa. St. 324; *Delaplane v. Crenshaw*, 15 Grat. 457; *Bowen v. Stoddard*, 10 Met. 375; *Foley v. Bell*, 6 La. Ann. 760; *State ex rel. Att'y Gen. v. Cunningham*, 81 Wis. 440; *State ex rel. Raymer v. Cunningham*, 82 id. 39; *State ex rel. Weiss v. District Board*, 76 id. 195.

8. The doctrine of absolute liability of the state treasurer

The State vs. McFetridge and others.

for the moneys in his custody has no application here and constitutes no defense to this action. This entire doctrine has been repudiated by the supreme court of Indiana in *Hunt v. State ex rel. Anderson*, 124 Ind. 306; *Rowley v. Fair*, 104 id. 189. Other courts have manifested a disposition to recede from the doctrine. *U. S. v. Thomas*, 15 Wall. 337, which practically overruled *U. S. v. Prescott*, 3 How. 578; *State v. Houston*, 78 Ala. 576; *York Co. v. Watson*, 15 S. C. 1; *People ex rel. Nash v. Faulkner*, 107 N. Y. 477; *Cumberland Co. v. Pennell*, 69 Me. 357. The legislature of this state, being vested with power, made provisions directing the treasurer to keep the moneys *in the vaults of the treasury*. R. S. sec. 159. If the treasurer had complied with this requirement, and the moneys had been lost by fire or tempest, or even robbery, without his fault or negligence, he could not be held accountable. Under this statute, then, the doctrine of absolute liability can have no application to this case. The doctrine is moreover not material to the determination of this case, because the conclusion which counsel seeks to draw therefrom — namely, that because of such responsibility the treasurer becomes the debtor of the state, with the right to do with the money as he sees fit — does not necessarily or logically follow. *State ex rel. Bladen Co. v. Clarke*, 73 N. C. 255.

*William F. Vilas*, of counsel for the respondent, argued, among other things, that the title and ownership of the moneys in the state treasury were not in the treasurer, but in the state. Both in the constitution and in all the statutes the treasury of the state is treated and spoken of as a physical thing, and from them it is clear that whatever was received *into* should, until lawfully paid *out of*, continue to *remain within*, the vaults of the treasury. The legislature prescribed a place for the keeping of the state's money, required it to be kept there, and imposed on the treasurer only the duty to have charge of it in that place. It is a

strict conclusion that the treasurer is bound to keep the *same* money which was put into, and not paid out of, but must remain in, the treasury, and this is not only recognized but even specifically enjoined on the treasurer. The bond of the treasurer in everything comports with his character [of a mere custodian. He does not engage, like a town treasurer, " to truly account for and pay over according to law all moneys which shall come into his hands as such treasurer" (R. S., sec. 835), but only to deliver to his successor all books, records, etc., " belonging to his said office." He is no more the owner of the money than of the furniture in his office. The consequences of holding him to be the owner,— as, for instance, in case he should die while in office,— show that the title to the moneys cannot be in him. If it were true that the state had made it one of the responsibilities of the treasurer that he should be absolutely answerable for the loss of any of the money committed to his custody, this would not transfer the title to him. He who accepts the office with its honors and lawful compensation, takes it also *cum onere*. But no such extreme responsibility is imposed on the state treasurer. No statute so declares, either directly or by implication. He is required to keep the moneys of the state in a certain *place*, and to keep there the same moneys he receives. His bond contains no engagement except for faithful discharge of duty and the delivery, at the end of his term, of the effects of his office, including money as other property, to his successor. The full measure of his responsibility is legally expressed in the words that he shall " have charge " of them in the treasury. In the absence of special obligation imposed by law or agreement, a bailee for the purpose of custody is chargeable only with diligence commensurate with the peculiar conditions affecting the subject. *U. S. v. Thomas*, 15 Wall. 337, 342; *Ross v. Hatch*, 5 Iowa, 149; *Foster v. Essex Bank*, 17 Mass. 479. There are three classes

of treasurers who are rightfully held to be absolutely an-
swerable (though in two, at least, now with some qualifi-
cation) for the money chargeable to them : (1) Treasurers
who take the money as owners of it, as a banker takes a
depositor's, a borrower a lender's, bound only to return as
much when lawfully required. Treasurers of this class are
most commonly of the minor public divisions, or of lesser
importance, for whom the public makes no provision of
means for custody, of place or office; or, if so, imposes no
limitation to use them. (2) Treasurers who take the public
moneys as such, but with the special obligation imposed
by law to keep it safely and pay over absolutely all they
receive. Such are the federal custodians of every grade.
(3) Treasurers who charge themselves by a special agree-
ment in their bonds with this added responsibility; in which
case, but only to the extent of the penal sums of their
bonds, they are bound to keep safely and pay over all they
receive, because they have agreed to. In the latter two
classes, the only reason for the liability is that the officer
has taken the office on that condition in the law or has
agreed to bear it; but this fact confers on him no attribute
of ownership over the property which is not otherwise
given. This is the true distinction of the adjudged cases.
*U. S. v. Prescott,* 3 How. 578; *U. S. v. Dashiel,* 4 Wall. 182;
*U. S. v. Keehler,* 9 id. 83; *Boyden v. U. S.* 13 id. 17; *Bevans
v. U. S.* id. 56; *Comm. v. Comly,* 3 Pa. St. 372; *U. S. v.
Thomas,* 15 Wall. 343; *State v. Harper,* 6 Ohio St. 607;
*Cumberland Co. v. Pennell,* 69 Me. 357; *State v. Houston,*
78 Ala. 576; *York Co. v. Watson,* 15 S. C. 1; *Ross v. Hatch,*
5 Iowa, 149.

The state treasurer as one of the board of public land
commissioners stood charged with all the peculiar duties
and obligations of a trustee for the investment and lending
to profit of the public moneys. One of the conditions of
his bond was for the faithful discharge of his duties as a

member of that board, and the breach of this condition is assigned among others.

It being clear that the money in the treasury belonged to the state and not to the treasurer, the ownership of the interest paid for its use, and the duty of the treasurer in respect to such interest, are clear. Gains of money in interest paid for its use belong to the owner of the money unless he makes another disposition of it himself. *Earl of Lonsdale v. Church*, 3 Brown, Ch. 44; *Willis v. Commissioners*, 5 East, 22; *U. S. v. Mosby*, 133 U. S. 286; 24 Ct. Cl. 14; *Supervisors v. Wandel*, 6 Lans. 33, affirmed, 59 N. Y. 645; *Hunt v. State ex rel. Anderson*, 124 Ind. 306; *Hughes v. People*, 82 Ill. 78; *Cooper v. People*, 85 id. 417; *Chicago v. Gage*, 95 id. 593. The cases referred to, as if to the contrary of this doctrine, which have recognized the right of some public treasurers to interest gained by them on the moneys which came to their hands, are, with perhaps a single exception, in strict accord with it, indeed, based upon it. They go upon the idea that such treasurers are mere debtors to the public for the money received by them, and own the money themselves as any debtor does, though under obligation to pay the amount at a future time. As has been seen, there are many public officers whose relations are of that nature.

It is useless to say that no *interest* was received by the defendant treasurer, but merely a sum paid voluntarily to him individually. The deposits were loans to the banks, and any sums paid by them for the use of the money belong to the state. *Sargeant v. Downey*, 49 Wis. 528; *Nat. Bank v. Ins. Co.* 104 U. S. 54, 63; *State v. Keim*, 8 Neb. 63; *First Nat. Bank v. Gandy*, 11 id. 431. The state could have followed these moneys as its own into the vaults of the borrowing banks, and recovered them with their produce of interest directly by suit. All the deposits were in the name of the treasurer as such; whereby the banks were fully charged

with notice of the state's rights, and with all the responsibility knowledge of them imposed. *Nat. Bank v. Ins. Co.* 104 U. S. 54; *Duncan v. Jaudon,* 15 Wall. 165; *Shaw v. Spencer,* 100 Mass. 382; *Brush v. Ware,* 15 Pet. 93; *Bayne v. U. S.* 93 U. S. 642; *Wolffe v. State,* 79 Ala. 201; *Mechanics' Bank v. Hallowell,* 52 Me. 545.

The sureties are liable equally with the treasurer on his bond for the failure to account for these interest moneys belonging to his office.    The interest being an accretion to the fund could no more be withheld by the treasurer than the fund itself.    It is contended that the sureties cannot be held for the interest moneys as belonging to the treasurer's office, because they were not in fact paid into the treasury,    But the sureties are bound for any failure of the treasurer to discharge his duties as well as to deliver to his successor the moneys belonging to his office, and if these interest moneys ought to have been put into the treasury the breach of the bond is complete.    The distinction as to moneys received *virtute officii* and *colore officii* has no place with reference to a keeper of the public money, as applied to money which his duty requires him to treat as of right belonging to the public.    As it was part of the treasurer's duty to put the public moneys to use to gain interest, the right of the public to the interest he did actually gain is no less because he did not regularly pursue the course prescribed for such investment. *Mayor v. Nat. Broadway Bank,* 10 N. Y. Supp. 555, 559; *Hunt v. State ex rel. Anderson,* 124 Ind. 306.    If the transactions by which the interest was gained were illegal, the illegality was entirely the act of the treasurer himself and a breach of his official duties.

The alleged custom of the treasurers to deposit moneys in banks and to collect interest for them is not available to the defendant.    No usage or custom can ever justify a practice in plain violation of statutory law.    The custom

of officers to violate public law for their own gain can never operate to interpret it.   No custom can interpret the law, although its provisions be ambiguous or doubtful, unless it has been open, notorious, just, and reasonable, and has received general public acquiescence or the acquiescence of officials having full knowledge of the facts.

The following opinion was filed January 10, 1893:

LYON, C. J.   This case, and that of *State v. Harshaw*, *post*, p. 532, which involves substantially the same legal questions, were argued together in this court.   It is proper and just to say at the outset that the arguments contain abundant evidence of the great labor and research bestowed upon the cases by the able counsel of the respective parties to the controversy.   We acknowledge our obligations to counsel for the great aid we have derived from their arguments.   We shall not discuss all the propositions argued, and shall refer to comparatively few of the numerous cases and authorities cited in their support, although we have carefully examined large numbers of them.   These citations will be preserved in the report of the cases.   We think the determination of these cases must be controlled by the construction which is given to certain statutes concerning the rights, duties, and liabilities of the state treasurer and the sureties in his official bond, and by the application of certain principles which are quite elementary in the law. With these preliminary observations, we will proceed to consider the *McFetridge Case*.

The alleged failure of the state treasurer, the defendant *Edward C. McFetridge*, to perform his duties as one of the commissioners of the public lands in the investment of the trust funds in the treasury, under secs. 258, 258a, 262a, S. & B. Ann. Stats., which is assigned in the complaint as a breach of the condition of the bond in suit, has no significance on this appeal, for the reasons that no findings in

respect thereto were made or demanded, and no exception is preserved in the record which presents the matter of such alleged failure of duty to the consideration of this court. No further reference to the subject will be required. On this appeal, therefore, this is simply an action at law on the official bond of the state treasurer, *McFetridge*, against him and his surviving sureties in such bond, to recover certain sums of money which he received from time to time during his specified term of office, from banks and banking associations and firms, as compensation paid by them on loans of public funds to, or deposits with, such banks, associations, and firms. (For convenience these depositaries are referred to in this opinion under the general designation of banks.)

It is strongly urged on behalf of the defendants that, although the treasurer may be liable to the state in some form of action for the money thus received by him on account of such loans or deposits, yet, unless the sureties are also liable therefor on the bond in suit, there can be no recovery in this action against the treasurer. This is probably a correct statement of the law. At least, for the purposes of this case it will be so regarded. In determining whether the sureties are liable on the bond for the alleged breach thereof, it will not be forgotten that their liability must not be extended by mere implication beyond the letter of their undertaking. This court has always held rigidly to this rule. In its latest deliverance on the subject, in *Drinkwine v. Eau Claire*, 83 Wis. 428, in the opinion by Mr. Justice PINNEY it is said: "The liability of a surety is *strictissimi juris*, and cannot be extended by implication. He has a right to stand on the exact words of his contract. 'The bond speaks for itself, and the law is that it shall so speak, and that the liability of sureties is limited by the exact letter of the bond, and, if the words will not make them liable, nothing can.' There is no con-

struction, no equity, against sureties. *Dobbin v. Bradley*, 17 Wend. 422; *State v. Medary*, 17 Ohio, 565; *Myres v. Parker*, 6 Ohio St. 504; *Supervisors v. Bates*, 17 N. Y. 242."

In the light of the above rule we are to determine whether there has been any breach of the condition of the bond in suit, to the injury of the state, for which, under legal rules, the sureties can be held liable on their bond. If there has been such breach, it is of the condition that ".said *Edward C. McFetridge* shall deliver over to his successor in office . . . all moneys . . . belonging to his said office." As a matter of course, if he has not done so there is also a breach of the condition that he "shall faithfully discharge the duties of the said office of state treasurer," one of which duties is to deliver to his successor, at the expiration of his official term, all moneys belonging to his office remaining, or which should be, in his hands. It will be assumed for the purposes of the case that, if the deposits in question were made without lawful authority, the interest thereon was illegally received by the treasurer, and that in such case there is no liability therefor on the official bond of the treasurer. If the money received by Treasurer *McFetridge* from banks as interest on the state funds loaned to or deposited with them was lawfully received by him, and if the same belonged to his office as state treasurer,— that is to say, if such interest is of right the money of the state, and not of the treasurer in his individual capacity,— it was his duty to deliver or pay over the same to his successor in office, and his failure to do so is a breach of the condition of his bond for which he and his sureties are liable, in an action at law thereon, to the extent of the money thus received and not accounted for. Hence the question is, Was the money received by Treasurer *McFetridge* from the various banks as the consideration of his depositing the public funds with them lawfully received by him, and, if so, does it belong to the treasurer individu-

ally, or to his said office of treasurer, that is, to the state?

If we correctly understand the argument on the part of the defendants, it is that on either of three propositions or hypotheses the money here in controversy belongs to the treasurer individually. These propositions are:

*First.* The legal title to the public money which came to the hands of Treasurer *McFetridge* is in him, and not in the state; that the relation between him and the state was that of debtor and creditor only, and hence that it is no concern of the state what the treasurer did with the public money, or how much profit he made out of it, provided he accounted properly for what he received; that his obligations to the state were fully performed when he paid or delivered to the persons entitled thereto the amount of money which he received in the first instance; and hence that the sums received by him from the banks in which he deposited the public funds, as interest on such deposits, whether paid to him as a gratuity or pursuant to a previous agreement or understanding, belonged to him individually, as incident to the legal ownership of the money.

*Second.* The deposit of the public funds in banks by Treasurer *McFetridge* was without authority of law, and it was not in the contemplation of the state or the sureties in his official bond that he would make such deposits and receive interest thereon. Hence liability for such interest, even though the state may recover it of the treasurer, is not within the true intent and meaning of the condition of his bond, and the sureties are not liable therefor.

*Third.* If the first proposition above stated is negatived and the state held to be the owner of the public funds that came to the hands of Treasurer *McFetridge*, he is still absolutely liable on his bond to account for and pay over to the persons entitled thereto, or deliver to his successor in office, all such funds. Because he is thus absolutely liable therefor, the ordinary liability of a trustee to account to his *cestui que*

*trust* for all profits made by him out of the trust money or property does not exist, and the money claimed in this action is not recoverable by the state, but belongs to the treasurer individually.   This proposition assumes that the deposits were lawfully made and the interest claimed lawfully received by the treasurer.

We now proceed to consider the above propositions in the order stated, and the determination of them is believed to be decisive of the judgment which ought to be rendered in the case.

I. It is assumed for the purposes of the case that, if the legal title to the public funds which lawfully came to the hands of Treasurer *McFetridge* was vested in him, there can be no recovery by the state, either against him or the sureties in his official bond, for any profit he may have made by the use of such funds.   The question whether the state is the owner of the public funds in the hands of its treasurer, or whether the legal title thereto is in the treasurer, must be determined by the statutes prescribing the rights, duties, and liabilities of the treasurer.   These statutes will be referred to and considered as briefly as possible.

Sec. 152, R. S., is as follows: " The treasurer shall keep his office at the capitol, shall receive and have charge of all money paid into the state treasury, and shall pay out the same as directed by law."   Sec. 153 requires him to give a bond, with sureties, conditioned (among other things) for the faithful discharge of the duties of his office, and that he shall deliver to his successor in office, or other person authorized to receive the same, all moneys, property, etc., " belonging to his said office."   Sec. 154 requires the governor to exact an additional bond of the treasurer in several contingencies, one of which is, " whenever the funds in the treasury shall exceed the amount of the treasurer's bond."   Sec. 157, subd. 1, makes it the duty of the treas-

urer to keep a cash book, and to enter therein " a detailed
account of all money received by him and disbursed," which
book he is required to deposit weekly with the secretary
of state.    Subd. 2 makes it the duty of the treasurer " to
pay out of the state treasury," on demand, the amounts
specified in proper warrants drawn by the secretary of
state, and provides that "he shall pay no money out of the
treasury " except in pursuance of some law authorizing him
to do so.    Subd. 7 requires him to report quarter yearly to
the governor " the total amount of funds in the treasury,
*specifying in what kinds of currency they consist, and the
amount of each kind*," etc.    Subd. 8 requires him also to
report to the governor, at stated times, " a full and detailed
statement of all money received into and paid out of the
treasury " during the times specified in the statute.    Sec. 159
is as follows: " The governor and attorney general shall, at
least once in each quarter year, and at such other times as
the governor may elect, examine and see that all the money
appearing by the books of the secretary of state and state
treasurer as belonging to the several funds is in the vaults
of the treasury, and in case of a deficiency shall require the
treasurer to make up such deficiency immediately; and if
such treasurer shall refuse or neglect for ten days there-
after to have the full sum belonging to said funds in the
treasury, the attorney general shall institute proceedings
to recover the same."    Sec. 4419, the provisions of which
doubtless extend to and include the state treasurer, makes
it *prima facie* evidence of the embezzlement thereof if the
treasurer loans or deposits the public funds in his hands
" for his own gain, profit, or advantage, without special
authority."    This section also contains the following pro-
vision: " Every public officer shall promptly pay over, as
required by law, the same moneys received and held by
him by virtue of his office, and the whole thereof."

The above statutes were all in force when, and for a

long time before, the bond in suit was executed. From beginning to end they are entirely inconsistent with the theory that the legislature intended by the enactment of any of them to vest the state treasurer with the legal ownership of the public moneys which come to his hands, thus making him merely the debtor of the state in respect thereto. If such were his relation to the state, it would be difficult to show that such funds were not subject to be seized for his debts, or, in case of the death of the treasurer in office, that the same would not go to his administrator as part and parcel of his estate, the state being, perhaps, a preferred creditor. It is inconceivable that any legislature could intend such results, and there is nothing in any statute which forces the conclusion that they did so. A close analysis of the above statutes, or any extended discussion of them, is quite unnecessary, for a perusal of them is sufficient to carry conviction to the mind that the legislature never intended to divest the state of its title to the public funds in the hands of its treasurer, and the consequent control over those funds which results from ownership thereof. We must therefore negative the first proposition above stated, and hold that the state was the owner of the public funds which came to the hands of Treasurer *McFetridge.* Some of the above statutes are hereinafter referred to on another branch of the case, and a construction given them; but such construction does not diminish their persuasive force as showing that the state is the owner of such funds.

Before leaving this branch of the case it may be observed that, in the argument of this appeal, the question of the ownership of these funds was not made as prominent as it appears to have been on the trial of this and the *Harshaw Case* in the circuit court. At least one of the counsel in the latter case conceded that the state remains such owner. However, all of the counsel for the defendants who participated in the argument disclaim that they conceded in

the circuit court that the money claimed in this action belongs to the owner of the funds thus deposited in the banks, and maintained that, although the state is the owner thereof, still it is not entitled to the interest thereon paid by the banks to the treasurer, whether such deposits were legally or illegally made. This contention is embraced in the second and third propositions or hypotheses above stated. These will now be considered.

II. Was the deposit by the treasurer in banks, in his name of office, of the public funds in his hands belonging to his office, which were deposited subject to his draft therefor at any time as such and only as such treasurer, an unauthorized and illegal use of those funds? Many adjudications elsewhere hold the doctrine that, if the treasurer was prohibited by law to make such deposits, he is not liable to account to the state for any interest received by him thereon. So far as we have been able to discover, none of the adjudications contain a very satisfactory statement of the principle upon which they rest. But we suppose it to be that such unlawful deposit of the funds is a conversion thereof by the treasurer to his own use, as indicated in *Surgeant v. Downey*, 49 Wis. 528, and other cases in this court, the measure of damages for which conversion is the sum thus converted, with interest thereon from the time he should have paid the money to the creditors of the state, or delivered the same to his successor in office, as required by law. If, before any lawful demand therefor, the treasurer thus pays over or delivers the amount so converted by him, the damages which the state might otherwise have recovered of him and his sureties are satisfied, and the right of action is gone, although he may have made gains by way of interest, or otherwise, out of the money thus converted.

For reasons hereinafter stated it is unnecessary to determine whether, if the treasurer illegally made such deposits,

he fulfilled his obligations to the state when he paid over the funds thus deposited as required by law. It may be observed, however, that, whatever the rights of the sureties are in such case, to allow the treasurer to escape accounting to the state for gains accruing from his illegal use of the public funds looks very much like allowing a public officer to profit by his own wrong and breach of official duty. Courts should be slow to assert the right of a delinquent official to such gains, unless compelled to do so by plain rules of law. But let it be assumed for the purposes of the case that, if the deposits were (as the defendants allege) illegally made, this action must fail, and we are brought to consider and determine whether they were so made.

These deposits were made in the name of the treasurer, in his official capacity as such. No time of credit was given upon them, but they were payable whenever required by the treasurer, and they could only be drawn on the official draft or check of the treasurer. They were made in accordance with the usual and long-continued course of business in that department of the state government. They were not made primarily for the purposes of gain or profit to the treasurer, but because the exigencies of the business of the department, and the reasonable convenience of creditors of the state, rendered it almost absolutely necessary that state funds should be kept in different portions of the state, and in the cities of Chicago and New York, against which the treasurer might draw to pay appropriations. Such methods had prevailed, and deposits had been made in banks, and drawn against, by all the different state treasurers, for thirty years or more before the execution of the bond in suit. A large portion of the public funds were thus kept on deposit during that whole period, and disbursed through the instrumentality of tens of thousands — even hundreds of thousands — of drafts or checks

drawn by the respective treasurers in their name of office against such deposits. To say of any adult citizen residing in the state during any considerable portion of that period, especially if he was a member of the legislature, that he did not know of such course of business, would be an impeachment of his intelligence. Under these circumstances it is reasonable to hold that the state treasurers were justified in transacting the business of their department as they did transact it, and as such business is almost invariably conducted in the commercial world, unless those methods were prohibited by some statute of the state. And this brings to us an examination of the statutes bearing upon the subject.

It may correctly be assumed, we think, that if the making of such deposits was prohibited at all the prohibition must be found in one or more of the following statutes: Secs. 152, 155, 160, 4419, R. S., above referred to, and the provisions for the investment of the trust funds, being secs. 258, 258a, 262a, S. & B. Ann. Stats. It is maintained in behalf of the state that under secs. 152 and 4419 it was the duty of the treasurer to pay out, or deliver to the persons entitled thereto, the same identical coin and currency paid into the treasury, and that the deposits in question came within the provision of the latter section, making it a crime on the part of the treasurer to loan or deposit the public funds for his own gain, profit, or advantage, without special authority, which of course would render the deposits unlawful. Also, that under sec. 159, until lawfully paid out, it was the duty of the treasurer to keep such coin and currency in the vaults of the treasury, which is claimed to be the vault or safe in the treasurer's office in the capitol; and, further, that the deposit thereof with banks by the treasurer, on his own responsibility, was an investment of the funds prohibited by secs. 160, 258, S. & B. Ann. Stats. These statutes will now be examined with

reference to determining whether they, or either of them, when fairly construed, contain the alleged prohibition to make the deposits in question.

*First.* It is claimed that the provision in sec. 4419, R. S., making it *prima facie* evidence of embezzlement if any officer or other person who has the care, custody, or possession of the money or property of another, loans or deposits it for his own gain, profit, or advantage, without special authority, prohibits the state treasurer from making the deposits in question, inasmuch as he made them with the intention of converting to his own use (and afterwards did so) any interest the banks should thereafter pay him on such deposits. The question is, therefore, Were the deposits in question made for the gain, profit, or advantage of Treasurer *McFetridge,* within the true intent and meaning of that provision? We are of the opinion that this question must be answered in the negative. To subject a public officer to the serious penalties of the statute there must be something in the character and incidents of the deposits to show that he has disregarded the obligations of his trust in making the same, or it cannot justly be said that he deposited the money for his own gain, profit, or advantage. So long as his actions are within the line of his duty he is not an embezzler, although he may intend at some future time unlawfully to appropriate to his own use the trust funds, or some portion thereof, or the interest realized thereon. The deposits under consideration (assuming that there was no other legal objection to the making thereof) were regularly made by the treasurer, in his official capacity as such, for the benefit of the state, and could only be drawn on his official draft. The authority to contract for interest on such deposits is as broad as the right to make them, for the statutes contain no special restriction in the matter of such interest. True, there was a question between the treasurer and the state as to which

of them was entitled to the interest. The treasurer claimed it, and intended, if it came to his hands, to keep it. Having done so, perhaps he committed an offense against the statute. But when he made such deposits he did no overt act tending thereto. The incipient offense (if he afterwards committed it) rested entirely in intention, liable at any time to be abandoned. No person can lawfully be convicted of an offense merely because he intended to commit it but did nothing in execution of such intention. The deposits having been made for the benefit of the state, by the state treasurer in his official capacity, in due course of business, with the intention, afterwards executed, to pay the amounts thereof to the persons lawfully entitled thereto, the intention formed in his mind to retain to his own use any interest the banks might thereafter pay him on account of such deposits is not sufficient to characterize the act of making such deposits as a conversion to his own use of the funds thus deposited, and an embezzlement thereof. Let us illustrate. Suppose on the next day after the treasurer had made one of these deposits in some bank he was prosecuted for embezzlement under sec. 4419. Concede that he stipulated for interest on such deposit, and intended, after such interest accrued and was paid to him, to keep it as his own. Still he made the deposit as treasurer, for the benefit of the state, and for the purpose of paying the amount thereof to the creditors of the state on proper warrants. The prosecution would necessarily fail, for he embezzled nothing, and the fund he intended to retain unlawfully had never been in his hands; in fact, had not accrued when the deposit was made. He did no act to evidence an intention to embezzle such interest, and there is nothing to support the prosecution but a mere mental process or intention entirely unexecuted. This is not sufficient.

Had the treasurer made such deposits in his individual name, and it could be proved that he did so for the pur-

The State vs. McFetridge and others.

pose of enabling him to embezzle the money so deposited, or a portion of it, it might well be said that he thereby committed an offense under sec. 4419; but we cannot understand how this can truly be said of official deposits in regular and proper form, if otherwise lawfully made.

We conclude, therefore, that Treasurer *McFetridge* did not commit a criminal offense under sec. 4419 when he made the deposits in question.

*Second.* The next question is: Do sec. 152 and the provision of sec. 4419, above quoted, require that the treasurer shall keep and pay out the same identical money he received by virtue of his office,— that is to say, the same specific coin or currency thus received by him? The above statutory provisions have their origin in R. S. 1849, ch. 134, sec. 30, or perhaps at an earlier date, and are retained in R. S. 1858, ch. 165, sec. 34. Said sec. 30 required any person having public funds in his hands to " pay over the same money that he may have received in the discharge of his duties." The object sought to be attained by such statutes is very plain. Their enactment was due to the fact that a large portion of the circulating medium of the country consisted of bank notes, which passed freely as money but were not legal tender for pecuniary obligations. The value of this kind of currency was constantly fluctuating. When depreciated, treasurers were liable to be tempted to purchase it at a discount with more valuable funds, perhaps coin, in their hands, and pay the public creditors with such depreciated currency at the face value, thus making for themselves the amount of the discount. That this practice prevailed to a considerable extent in the times when such depreciated currency was in circulation, to the manifest injury of public creditors and the disgrace of the public service, is well known. The law was enacted, and has since been retained, to prevent such dishonesty and wrong. Inasmuch as, practically, all the currency now in circula-

tion in the country as money possesses the legal-tender quality, the law has ceased to be of much importance. Manifestly, it was never intended to require the treasurer to pay out the identical coins or treasury notes or coin certificates received by him officially for the state, but only that he should not receive good money into the treasury, and pay the public creditors with depreciated funds, if any such are in circulation. Any other construction of these statutes would ignore the reasons for their enactment, and in our opinion would lead to manifest absurdity. The better view is, we think, that if the public creditors receive directly from the hands of the treasurer, or from banks on the treasurer's draft, money having the same value and essential qualities as that paid into the treasury, the treasurer does pay out "the same moneys received and held by him by virtue of his office," within the meaning and intention of the statutes under consideration. This is so because money is in its nature severable,— one coin or note having the same essential qualities and value possessed by any other of like denomination, and the law does not concern itself to trace and identify each specific coin or note.

*Third.* Was Treasurer *McFetridge* required by law to keep, in legal tender coin or currency, all the public funds in his hands as treasurer in the vaults of the treasury? If so, he could not, of course, lawfully make general deposits thereof in banks. The claim that such was his duty is rested solely upon the provisions of sec. 159, R. S., which has already been copied at length herein. This section was first enacted in 1876, and stands as sec. 5, ch. 340, of the laws of that year. It is argued that the term "the vaults of the treasury" means the iron vault or safe in the office of the state treasurer in the capitol, and that the term "money," as employed in the statute, means the actual coin and currency of the country. This construction is, we think, too narrow, for it ignores the customary and neces-

The State vs. McFetridge and others.

sary processes universally employed in the conduct of business affairs, and the methods by which the business of the treasurer's office has been conducted from its first organization, and would work a violent and unnecessary change in those methods, to the great detriment of the public business and the inconvenience and damage of public creditors. We are not aware of the existence of any conditions when that statute was enacted which called for such an extreme remedy.

On the contrary, in addition to the conditions already mentioned, it is well known that a large portion of the revenues of the state — ninety per cent. thereof, it is said — are paid into the treasury in the form of checks, drafts, and certificates of deposit. The construction of sec. 159 contended for would require the treasurer to demand that the revenues of the state should be paid to him in lawful money, that is, legal tender funds, or else would compel him to collect such checks, drafts, or certificates of deposit in lawful money, and place the proceeds, and other money thus received by him, in the vault in his office, in order to be prepared for the official inspection of the governor and attorney general. It is impossible to impute any such absurd intention to the legislature.

It may be conceded, for the purposes of the case, that such restricted construction of the statute in respect to what is meant by the term " vaults of the treasury " is the correct one (a proposition we might hesitate to hold were it necessary definitely to determine the meaning of the term), but we cannot agree that the word " money," as there employed, means only the actual coin and currency in circulation as money. Such a construction would be extremely technical, and is, we think, uncalled for. " Money " is a generic term, and may mean, not only legal-tender coin and currency, but also any other circulating medium, or any instruments or tokens in general use in the

commercial world as the representatives of value. It includes whatever is lawfully and actually current in commercial transactions as the equivalent of legal-tender coin and currency. Thus it is said in *Taylor v. Robinson*, 34 Fed. Rep. 678, that " the term ' money ' is used to designate the whole volume of the medium of exchange recognized by the custom of merchants and the laws of the country, just as the term ' land ' designates all real estate." 15 Am. & Eng. Ency. of Law, 701. We have no doubt that such is the sense in which the term is employed in sec. 159.

Certificates of deposit, or other vouchers for money deposited in solvent banks, payable on demand, are a most convenient medium of exchange, and are extensively used in commercial and financial transactions to represent the money thus deposited, and as the equivalent thereof. Hence the same are " money," within the meaning of sec. 159, and its requirements in that behalf were complied with by the treasurer if, in their examination under that section, the governor and attorney-general found " in the vaults of the treasury " the amounts called for by the books of the secretary of state and treasurer, although portions thereof were in such certificates or vouchers.

We conclude there is nothing in sec. 159 which rendered it unlawful for Treasurer *McFetridge* to make the deposits in question.

*Fourth.* Was the making of such deposits a violation of sec. 258, S. & B. Ann. Stats., which expressly prohibits the investment of the trust funds in any manner not authorized thereby, or of sec. 160, which by implication prohibits the treasurer from making investments of any other funds in the treasury without the approval of the governor? By those statutes such investments are restricted to the purchase of bonds of the United States, and of several states specified in sec. 258, and to loans to counties, towns,

cities, villages, and school districts for terms not exceeding twenty years. Secs. 258, 258*b*, and subd. 2, sec. 262*a*, S. & B. Ann. Stats. Investments of the trust funds must be made by the commissioners of the public lands. The treasurer alone has no authority to make any investment of the public funds. The deposits in question were made by Treasurer *McFetridge* from any and all the funds in the treasury, indiscriminately, although presumably his books showed what amount of each fund was thus deposited. Such deposits were made without the approval or concurrence of either of his associate commissioners of the public lands or the governor. If those deposits were *investments*, within the meaning of the above statutes, they were unlawfully made. Were they investments?

The distinction between a general deposit of money in a bank payable at any time on demand, and an investment of such money, is plain and substantial. By such a deposit the depositor does not lose control of the money, but may reclaim it at any time. True, he loses control of the specific coin or currency deposited, but not of an equal amount of coin or currency having the same qualities and value, which, as we have seen, is all that is required of him.

But if the funds in the treasury are invested in United States or state bonds, or in loans on time to counties, cities, etc., the treasurer loses control thereof, and the same cannot be replaced in the treasury until such bonds are paid or sold, or such loans become due and are collected by due course of law. The retention by the treasurer of substantial control over the funds in the one case, and his loss of such control in the other, mark the leading distinction between a mere deposit of the funds and an investment thereof, as those terms are used in statutes. This principle was applied by the supreme court of Pennsylvania in the case of *Law's Estate*, 144 Pa. St. 499. In the opinion of the court we find the following language: " A deposit is where a sum

SUPREME COURT OF WISCONSIN. [84

of money is left with a banker for safe-keeping, subject to order, and payable, not in the specific money deposited, but in an equal sum. It may or may not bear interest, according to the agreement. While the relation between the depositor and his banker is that of debtor and creditor simply, the transaction cannot in any proper sense be regarded as a loan unless the money is left, not for safe-keeping, but for a fixed period, at interest, in which case the transaction assumes all the characteristics of a loan." The above views meet our approval. A valuable note to that case, in which many cases are cited bearing upon and supporting these views, will be found in 14 Lawy. Rep. Ann. 103.

We are of the opinion, therefore, that in making the deposits in question with banks Treasurer *McFetridge* did not invest the state funds, and hence that he did not thereby violate the statutes which prohibited him from so doing.

It is believed that the foregoing discussion covers all the reasons urged in support of the contention that the deposits in question were illegally made and interest thereon illegally received by Treasurer *McFetridge*.

Our conclusion on the second principal proposition or hypothesis above stated is that Treasurer *McFetridge* did not violate any law of the state when he made general deposits of the state funds with banks, subject to his drafts therefor, payable on demand. It follows as a corollary to such conclusion that it was not unlawful for him to stipulate for payment by the banks of interest on such deposits, and to receive such interest. It is understood — indeed, is a matter of common knowledge — that when the present state treasurer, Mr. Hunner, went into office, he continued the former practice of depositing the funds in banks and exacting and receiving interest thereon, but, contrary to such practice, he accounted to the state for such interest, by charging himself therewith in his account with the state, and paid out the same as the money of the state. In all

this he was undoubtedly strictly within the line of his duty. The mode of making such deposits is now regulated by ch. 273, Laws of 1891.

On the theory that the deposits in question were illegally made and interest thereon illegally received, it was claimed on the argument for defendants that it is essential that the legislature waive such illegality, and ratify those transactions of the treasurer, before the state can maintain this action. It is said that, in the absence of such ratification, the state is claiming the fruits of illegal transactions. Whatever force there might be in this position were the money sought to be recovered the proceeds of an illegal contract, it ceases to be significant after it has been determined that the transactions through which the money was obtained were legal. If there has been a breach of the condition of Treasurer *McFetridge's* official bond to the injury of the state, it was the duty of the attorney general, on request of the governor or secretary of state (which request will be presumed), to bring suit on such bond, and special legislative authority to do so is not essential to the maintenance of the action. R. S. sec. 163.

III. Having determined that the public funds which came to the hands of Treasurer *McFetridge* belonged to the state, and that he violated no law when he deposited such funds in banks and stipulated for and received interest thereon, we are next to determine the third and last proposition or hypothesis of the defendants, which is that the treasurer was absolutely liable to the state on his official bond for all the money of the state which came to his hands by virtue of his office, and that, because of such absolute liability, any interest he may have realized on such deposits belonged to him individually. While such absolute liability of the treasurer will be assumed for the purposes of the case, it seems to us that no such conclusion necessarily results therefrom. The treasurer may well be held

liable absolutely for all moneys of the state coming to his hands, and be held liable also for interest on the deposits in question. Stated in another form, such absolute liability does not necessarily estop the state to maintain that such interest was received by the treasurer by virtue of his office and belongs to his office. There are cases, however, which apparently sustain the contention of defendants' counsel on this branch of the case. Some of them will now be examined for the purpose of ascertaining whether they do so hold, and if so, upon what grounds the doctrine is rested.

The case of *State v. Walsen,* 17 Col. 170, recently decided by the supreme court of Colorado, is much relied upon by counsel for defendants to sustain their contention. Like this action, it was brought by the state on the official bond of a former state treasurer, against him and his sureties therein, to recover interest received by such treasurer on deposits of public funds made by him in banks, which interest was retained by him to his own individual use. It was held by the trial court on demurrer that the complaint failed to state a cause of action against the treasurer or his sureties, and the supreme court affirmed a judgment for defendants in such demurrer. We understand that the judgment in that case is rested by the court on two separate and distinct grounds, to wit: (1) Upon the statutes of that state; and (2) upon the absolute liability of the treasurer to account to the state for the public funds which come to his hands.

As to the first of these grounds. In March, 1889, one branch of the Colorado legislature, pursuant to a practice which seems to be authorized in that state, submitted to the supreme court certain questions relative to the validity of certain proposed legislation affecting the care, custody, and control of the public funds. In answering those questions the court took occasion to say: "It is eminently proper, and in view of sec. 13, art. X, of the constitution it

may be a legislative duty, to provide by statute that all interest paid by banks upon public funds deposited with them shall be placed to the credit of the state." In April of that year the legislature, presumably prompted thereto by the above suggestion, enacted a law the purpose of which, as correctly expressed in its title, being "to prohibit the conversion, loaning, or deposit for the benefit of officers, agents, and servants, of public funds belonging to the counties, cities, town, township and school districts of the state, and to prescribe punishment for the violation of the conditions hereof, and to repeal all acts inconsistent therewith." The act gives a right of action to any such municipality, or other subdivision of the state, against any such officer, agent, or servant who has contracted for or received, and against any person or association who has contracted to pay the same to the individual use of such officer, agent, or servant, any benefits or advantages because of the deposit of the public funds with such person or association. The term "benefits or advantages" was clearly intended to include interest on such deposits. The act industriously excludes the state treasurer from its requirements and penalties. Because it does so, the court held that the state had no right of action against the state treasurer, and, of course, none against the sureties in his official bond, to recover interest received and retained by him to his own use on such deposits of the public funds. This ruling alone was necessarily decisive of the case. Because we have no such statute in this state, the case, in that aspect of it, does not aid us in the determination of the present case.

But, as before stated, the court also rested its decision upon the further and independent ground that, because of the absolute liability of the treasurer to account to the state for all funds coming to his hands by virtue of his office, he cannot be required to account for interest received by him on the public funds thus deposited. This is laid down as a

general rule of law, unaffected by statutory provisions, and is of course as applicable in this state as in Colorado.

Perhaps the most effectual way to test the existence of the alleged rule is to examine the cases on the authority of which the Colorado court held that it existed. These are *Rock v. Stinger*, 36 Ind. 346; *Shelton v. State*, 53 Ind. 331; *Renfroe v. Colquitt*, 74 Ga. 618; *Comm. v. Godshaw* (Ky.), 17 S. W. Rep. 737. Other cases are cited to the proposition that the liability of a public officer for public funds is not necessarily, perhaps not usually, that of an ordinary bailee or trustee of money or property, who must always account to his bailor or *cestui que trust* for gains and profits made by him out of the trust estate. These last-mentioned cases will not be especially considered, for the proposition to which they are cited is undoubtedly correct. The liability of the treasurer in this case must be measured and determined by the statutes prescribing his duties and obligations. It is not sought to charge him with any mere common-law liability of a trustee or bailee.

In each of the Indiana cases cited it was held that the treasurer was the owner of the fund received by him as such treasurer, and for that reason he was relieved from the obligation to account for interest which he realized thereon. *Renfroe v. Colquitt*, 74 Ga. 618, like this and the *Walsen Case*, was an action on behalf of the state, against the state treasurer and the sureties in his official bond, to recover interest on deposits of public funds, which interest the treasurer failed to account for to the state, but appropriated the same to the use of himself and others. Like the Colorado case, it came before the supreme court of Georgia on writ of error from a judgment for defendants upon demurrer to the complaint. If we read the opinion of the majority of the court correctly, it was held that it appeared from the complaint that, in making such deposits of the public funds, the treasurer violated a penal statute

of the state, and that, in the absence of any statute enti-
tling the state to the interest on such deposits, the state
could not maintain an action therefor on the official bond
of the treasurer, for the reason that, having received the
money claimed through the instrumentality and by means
of an illegal and penal act, the treasurer did not receive
the same by virtue of his office. The court cites several
cases to the rule that the treasurer and his sureties are not
liable on his official bond for money coming to his hands,
unless he received the same lawfully by virtue of his office.
Among these are the cases of *Gerber v. Ackley,* 37 Wis. 43;
*Taylor v. Parker,* 43 Wis. 78. In these cases the distinction
is made between acts done *virtute officii* and those done
*colore officii* merely; the officer and his sureties being held
liable on his official bond for acts belonging to the former
class, but not for those belonging to the latter class. All
the cases cited in the Georgia case are to the same effect.
We fail to find in that case any intimation that the treas-
urer was not liable on his official bond for the interest
claimed because he was absolutely liable to the state for
the public funds which came to his hands. The case does
not, therefore, sustain the rule laid down in the Colorado
case as to the results which flow from the absolute liability
of the treasurer to the state.

*Comm. v. Godshaw,* 17 S. W. Rep. 737, is in some respects
a very peculiar case. It was brought in behalf of a county
upon the official bond of a county officer designated as
"trustee of the jury fund." Under the statutes of Kentucky
in force from 1880 to 1886, this officer received for disburse-
ment large sums of money, some of which lawfully remained
unexpended in his hands a considerable time. In 1886 the
statute was repealed, and another enacted in its place,
requiring that the portion of the fund not required for im-
mediate use should be paid to another officer. For some
insufficient reason (as the court held) the fund was all paid

to, and the surplus allowed to remain in the hands of, such trustee until 1890, notwithstanding the legislation of 1886. During the whole ten years such trustee deposited the surplus funds in his hands with banks, and received and retained to his own use interest thereon. The action was to recover the amount of such interest, and was brought against the trustee and his sureties. In its opinion the court states the rule to be that where, as in that case, the officer is absolutely liable to account for the fund, he is not liable for any interest he may realize thereon. The reason given for the rule is that in such case, as between the state or county and the officer, the fund must be treated as his money, and not that of the state or county. Having hereinbefore determined that the public funds coming to the hands of Treasurer *McFetridge* by virtue of his office belong to the state, the Kentucky case ceases to be valuable as an authority that the treasurer is not accountable to the state for interest lawfully received by him on deposits of the public funds. In that case it was held that for interest realized on the fund up to 1886, during which time the whole fund was lawfully in the hands of the trustee, he was not liable on his bond, but that he was so liable for interest received by him after that date, when the fund was unlawfully in his hands. In respect to the interest accruing after 1886, the fund out of which it grew was in the hands of the officer *colore officii* only, and the great weight of authority is, as was held in the Wisconsin cases above cited, that in such case there is no liability on the official bond of the officer.

The foregoing seem to be the cases most relied upon to sustain the proposition that Treasurer *McFetridge* and his sureties are relieved from liability on his official bond for the interest claimed, because of his absolute liability to the state for the public funds received by him by virtue of his office. With all due deference to the able courts which

have asserted or intimated the existence of the alleged rule under consideration, we are constrained to say that in our opinion they have failed to demonstrate, either by authority or upon principle, that the same has any place in our jurisprudence.

It has already been held herein that the public funds were lawfully deposited by Treasurer *McFetridge* with the banks, and that he lawfully received from such banks compensation by way of interest for the use of such deposits. Under those circumstances, and in the absence of any statute separating the interest from the fund and diverting it to other uses, such interest was an accretion or increment to the fund, thus becoming a part of it, and logically and necessarily belongs· to the owner of the fund, to wit, the state. .It is immaterial that the treasurer stipulated for interest on the deposits, or that the banks paid him such interest without stipulation, both the treasurer and the banks intending that he should retain the same as his own and believing that he was entitled thereto. Such intention and belief cannot affect the ownership of the interest or its essential character as a portion of the public funds in the hands of the treasurer. Notwithstanding such intention and belief, the interest was in fact paid to the state treasurer and belonged to his said office, within the meaning and intention of the bond in suit. A lawful act cannot be rendered unlawful merely because the actors intended to follow it by an unlawful act. So, when the treasurer lawfully receives money which of right belongs to his office, he receives it by virtue of his office, and cannot, by forming and executing an intention to retain the money as his own, divest the act of receiving the money of its official character. The fact remains that he received it *virtute officii.* This is a most salutary rule, which should never be departed from unless clearly abrogated by some statute. We find no such statute in this state.

Many cases have been cited which sustain, more or less directly, the views above expressed on this branch of the case. The following, in which public officers have been held to account for accretions to the public funds in their hands, are a few of them: *New York v. National Broadway Bank*, 10 N. Y. Supp. 555, affirmed, 126 N. Y. 665; *Earl of Lonsdale v. Church*, 3 Brown, Ch. 41; *Hunt v. State ex rel. Anderson*, 124 Ind. 306; *Willis v. Commissioners*, 5 East, 22; *U. S. v. Mosby*, 133 U. S. 273; *S. C.* 24 Ct. Cl. 14; *Supervisors v. Wandel*, 6 Lans. 33, affirmed, 59 N. Y. 645; *Hughes v. People*, 82 Ill. 78; *Cooper v. People*, 85 Ill. 417; *Chicago v. Gage*, 95 Ill. 593.

Probably some of the above decisions were influenced by special statutes; at least, such seems to be true of the Illinois cases. Yet it is believed that in all those cases the general rule of law is laid down and enforced, which, as applied to this case, is that the interest on the deposits in question received by Treasurer *McFetridge* was an increment to the funds of the state deposited by him in banks in his official capacity, and that the right to such interest was thereby vested in the state, and on receipt thereof by Treasurer *McFetridge* it became and was money in his hands belonging to said office. He not having accounted therefor, this action by the state on his official bond to recover the same may be maintained.

A large majority of the adjudications cited in the arguments of the case, aside from those specifically commented upon herein, may be classified as follows: (1) Those which hold that the officer owns the public funds which came to his hands, and for that reason cannot be required to account for gains derived therefrom. (2) Those which hold that, although the officer is not the owner of the funds, if he unlawfully use the same for his own profit, his gains cannot be recovered in an action on his official bond. (3) Those which hold that he is not such owner, and that

his liability to account for the public funds coming to his hands is absolute, or at least equal to the common-law liability of a common carrier for the safe transportation and delivery of goods committed to it for carriage, and yet that for any profit or gain made by the officer out of the use of such funds he must account to the owner of the funds, whether the same was made lawfully or unlawfully. (4) Those which hold that if the officer, not being such owner, makes gains out of the public funds by the lawful use thereof, such gains attach to the fund by way of accretion or increment, and become a part of it, and belong to the owner of the fund, and, if not accounted for, an action at law may be maintained on the official bond of the officer, against him and his sureties, to recover such gains.

Having determined that the fund thus deposited in banks by Treasurer *McFetridge* belonged to the state, we assume the accuracy of the rule held by the cases in the second class above mentioned, and under the rule of the cases in the fourth class, which we approve, we hold Treasurer *McFetridge* and his sureties liable in this action for the interest in question.

Brief reference will now be made to the argument that certain legislation in 1876 went upon the theory that theretofore interest on deposits was a lawful perquisite of the treasurer, which was cut off by such legislation, and restored by the Revision of 1878.

In February, 1876, Mr. Kuehn, who had just entered upon a second term as state treasurer, in reply to a resolution of inquiry, stated to the senate that during his first term as such treasurer he received between $24,000 and $25,000 as interest on deposits of state funds, which he claimed the right to retain as his own money in accordance with the alleged practice of his predecessors in office. In March of that year the legislature enacted ch. 341, Laws of 1876, fixing the salary of the state treasurer at $5,000 per

year, and providing that such salary should be "in full for all services rendered by him in his official capacity." It was also provided therein that "all fees and perquisites received by him from every source shall be paid into the state treasury and become a part of the general fund." Sec. 3. Also that such act should take effect on the first Monday in January, 1878. Sec. 7. These provisions are retained in the Revision of 1878 in sec. 157, subd. 10, and sec. 170, except the words "and perquisites" are omitted. The argument is that the interest in controversy is a "perquisite," and that because the legislature did not cut off such perquisites until the end of Mr. Kuehn's second term as state treasurer, and made no provision requiring him or any of his predecessors to account for the interest received by them, respectively, on deposits, the inference is plain that the legislature of 1876 were of the opinion that such interest was a lawful perquisite of the treasurer, and by plain implication authorized Mr. Kuehn to continue to appropriate the same to his own use through his second term; and further that, by the omission from the Revision of 1878 of the provision which required the treasurer to account for "perquisites," the legislature intended to restore his right thereto.

Whatever force there may be in the above argument, as applied to the interest retained by state treasurers before 1878, we think the omission of the term "perquisites" from the revision of that year had no significance when applied to such retention of interest after that date. When the statute provides that the salary of the treasurer shall be "in full for all services rendered by him in his official capacity," it cuts off all fees and perquisites as effectually as though the same were specially prohibited. After such statute took effect, but for other provision therein, the treasurer could not lawfully have exacted fees. But because the legislature desired to continue the collection of fees for the benefit of the state, it provided therefor and

for the payment of such fees into the general fund. This provision is retained in the revision. True, the same act provided, in form, that "perquisites" received by him should also be paid into that fund. The provision was nugatory because, unless the treasurer might retain to his own use what had theretofore been deemed perquisites, the same ceased to be such, and there was nothing for the provision to apply to. It was in this view, presumably, that the revisers and legislature omitted from the revision the term "perquisites," thus eliminating a useless and inoperative provision. The contention that Treasurer *McFetridge* was authorized to retain to his own use the interest received by him on deposits of state funds, based on the use and omission of that term in such statutes, must be negatived.

It has also been suggested that weight should be given to the alleged fact that it was well known — was really a matter of common knowledge — that all the state treasurers for more than thirty years before 1891, constantly received and retained to their own use interest on deposits of public funds, without objection by the legislature or other authorities of the state. However the fact may have been before 1878, there is no sufficient proof that the people or legislature, or the executive or administrative officers of the state, generally, had such knowledge, although, as a witness puts it, "it was in the air" that the practice prevailed after the legislation of 1876 took effect. There is much testimony tending to show that the practice was kept from the knowledge of the public as far as practicable.

Moreover, if every citizen and officer of the state knew that the practice prevailed, it would be difficult to show that a usage which takes from the state and gives to one of its officers, without authority of law, large sums of money belonging to the state, could be upheld as a valid custom.

Upon due consideration our conclusions upon the whole case are (and the court so holds) that the funds which Treasurer *McFetridge* deposited with banks were the property of the state; that in making such deposits as treasurer, and stipulating for and receiving interest thereon, or receiving interest thereon without such stipulation, he did not violate any law of the state; that such interest so paid to him, being an accretion or increment to the fund, increasing it by the amount of interest thus paid thereon, belongs to the state; that Treasurer *McFetridge* received such interest by virtue of his office of state treasurer, and the same belonged to his said office; that his failure to account therefor to the state, or to deliver the same to his successor in office, as required by law, is a breach of the conditions of his official bond; and that this action can be maintained on such bond, against him and his sureties therein, to recover the interest thus received by him and unaccounted for.

In determining this case the court has adopted many of the views of the learned circuit judge, but withholds its approval of others. Inasmuch as we arrive at the same conclusion reached by him, although by different processes of reasoning, it is unnecessary further to discuss the propositions in his very able opinion which we are not prepared to adopt.

*By the Court.*— The judgment of the circuit court is affirmed.

PINNEY, J., took no part.

Upon a motion for a rehearing it was contended on behalf of the appellants that the judgment allowing interest upon the claim of the state against the treasurer and his sureties from the expiration of his term of office was erroneous. The right of action was not complete until demand made. Until then there was no breach of the condition of

his bond. *Frink v. Southern Exp. Co.* 82 Ga. 33; *U. S. v. Hills*, 4 Cliff. 618; *U. S. v. Curtis*, 100 U. S. 119; *U. S. v. Poulson*, 30 Fed. Rep. 231. In view of the history of this question of interest on deposits made by state treasurers in banks, and of the evidence before the court in this case, it is strictly just to say that the right of the state to recover the sums claimed was doubtful and was contested on reasonable grounds. It is also true that the amount due was required to be adjusted by proceedings in the suit. In such case interest is only recoverable after the right of the party to recover and the amount of the recovery have been determined. *Shipman v. State*, 44 Wis. 458. The allowance of interest upon the claim is within the discretion of the court, and it ought not to be allowed by reason of the long delay on the part of the state in the assertion of its rights, no reasonable excuse for such delay being shown. *Redfield v. Ystalyfera I. Co.* 110 U. S. 174; *U. S. v. Sanborn*, 135 U. S. 271.

For the respondent, in opposition to the motion, it was argued that the right of action in favor of the state was complete upon the failure of the outgoing treasurer to account for and pay over these interest moneys, and no previous demand was essential to such right of action. *Joint School Dist. v. Lyford*, 27 Wis. 506; *Kewaunee Co. v. Knipfer*, 37 id. 496; *Milwaukee Co. v. Pabst*, 70 id. 352, 371; *Fond du Lac v. Moore*, 58 id. 170; *Remington v. Ward*, 78 id. 539; *Supervisors v. Wandel*, 6 Lans. 33; *Monroe Co. v. Clark*, 92 N. Y. 391. The amount of these interest moneys was known to the treasurer and capable of being accurately ascertained at any time. Interest was therefore chargeable on the account. *School Dist. v. Dreutzer*, 51 Wis. 153; 11 Am. & Eng. Ency. of Law, 386. Although interest was not expressly reserved in the bond, it was implied by the nature of the contract. It therefore became a part of the obligation, and is recoverable as of right. This proposi-

tion is the logical result of the decisions already cited. See, also, *Clark v. Wilkinson*, 59 Wis. 543; *Cleveland v. Burnham*, 64 id. 360. And see, further, in support of the rule charging the treasurer and his sureties for the amount of any deficiency in the public funds, with interest thereon from the day when the same should have been accounted for and paid over, *Sheridan v. Van Winkle*, 43 N. J. Law, 126; *State v. Sooy*, 39 id. 554; *People v. Gasherie*, 9 Johns. 71; *Slingerland v. Swart*, 13 id. 255; *Supervisors v. Clarke*, 25 Hun, 282; *Cassady v. Trustees of Schools*, 105 Ill. 560; *Stern v. People*, 102 id. 540; *Hudson v. Tenney*, 6 N. H. 457; *U. S. v. Curtis*, 100 U. S. 119; *State v. Moses*, 18 S. C. 366; *Dean v. State*, 54 Tex. 313; Murfree, Off. Bonds, secs. 326, 327. If there were any ground for the contention that the state has unreasonably delayed asserting its claim, it is settled that the government is never bound by the laches of its agents, and that such laches could not operate to release the sureties upon an official bond. Murfree, Off. Bonds, secs. 762-3; *U. S. v. Kirkpatrick*, 9 Wheat. 720; *Minturn v. U. S.* 106 U. S. 444; *Dox v. Postmaster General*, 1 Pet. 323; *Looney v. Hughes*, 26 N. Y. 522; *Detroit v. Weber*, 26 Mich. 284; *People v. Columbia Co.* 10 Wend. 363; *Att'y Gen. v. Supervisors*, 30 Mich. 392; *Parks v. State*, 7 Mo. 194.

The following opinion, entitled as in this case and also as in the case of *State v. Sawyer and others* (*post*, p. 532), was filed April 11, 1893:

WINSLOW, J. Motions for rehearing are made in these cases upon the ground that interest should not have been allowed upon the interest moneys received by the treasurers from the date of the expiration of their respective terms of office, but only from the time of the commencement of these actions, or, at most, from the time when demand was made. The ground is taken that these demands

The State vs. McFetridge and others.

of the state were in doubt and unliquidated, and consequently did not bear interest, and reliance is placed upon *Marsh v. Fraser*, 37 Wis. 149, and *Shipman v. State*, 44 Wis. 458. Both of the cases cited were for the recovery of claims strictly unliquidated and incapable of ascertainment by mere computation. Such is not the case here. It has already been held by the court, in these very cases, that the sums of interest on the public funds received by the treasurers from the banks became, when received, additions to the several funds, and belonged to the state; that the same were received by the treasurer by virtue of his office, and belonged thereto; and that the failure to deliver the same over to his successor in office was a breach of his official bond. These propositions are not now contended against. Under them it is difficult to see how the right of the state to recover interest from the time when the treasurer was bound to turn over the money to his successor can be successfully controverted. Certainly, it would be admitted, we think, that, if the main body of any of the state funds was not accounted for by the state treasurer at the time of the expiration of his term, interest would be recoverable thereon from the time he should, according to law and the terms of his bond, have paid it over. Under the decisions already made in these cases the interest moneys received stand on the same footing. They became at once, when received by the state treasurer, state money received by virtue of his office, and integral parts of the various funds which earned them. They were capable of exact ascertainment by computation. It was as much the treasurer's duty to turn these amounts over to his successors as to turn over the principal of the funds, and consequently a failure to do so is equally a breach of his bond, and no demand was necessary. The previous decisions of this court seem to settle the question. *Joint Sch. Dist. v. Lyford*, 27 Wis. 506; *School Dist. v. Dreutzer*, 51 Wis. 153;

*Milwaukee Co. v. Pabst*, 70 Wis. 357; *Kewaunee Co. v. Knipfer*, 37 Wis. 496.   See, also, to the same effect, *Monroe Co. v. Clark*, 92 N. Y. 391; Murfree, Off. Bonds, § 326.

*By the Court.*— Motions denied.

PINNEY, J., took no part.

A note on the liability of public officers for interest collected on deposits of public funds is published with the case of *State v. Walsen* (17 Col. 170), in 15 L. R. A. 456.— REP.