BENNETT v. BANK OF COMMERCE AND TRUST CO. et al.

(District Court, N. D. Mississippi, E. D.    September 22, 1914.)

No. 5.

1. COUNTIES ⊕182—BONDS—PURCHASE—MEDIUM OF PAYMENT—CHECKS.

The delivery to a county treasurer in payment of the purchase price of county bonds of a check payable to his order as treasurer, which he accepts and receipts for as money, and indorses and deposits as money in bank to his credit as such officer, constitutes a payment for the bonds.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 275–281, 283, 284; Dec. Dig. ⊕182.]

2. COUNTIES ⊕155—PAYMENTS TO COUNTY TREASURER—VALIDITY AND EFFECT—CONSTRUCTION OF STATUTE.

The provisions of Code Miss. 1906, §§ 352, 987, which require the issuance of a receipt warrant by a county auditor to authorize the payment of, money into the county treasury, are for the purpose of providing a system of checks between the auditor and treasurer, as a matter of bookkeeping, and the issuance of such a warrant is not a condition precedent to the vesting of title in the county to money actually paid to the treasurer, or to the discharge of the liability of the person making the payment.

[Ed. Note.—For other cases, see Counties, Cent. Dig. §§ 223–225; Dec. Dig. ⊕155.]

3. WORDS AND PHRASES—"MONEY."

"Money," in the modern meaning of the word, is not restricted to legal tender, coin or currency, but includes also such classes of paper as are in general use commercially as mediums of exchange.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Money.]

In Equity. Suit by W. T. Bennett, receiver, against the Bank of Commerce and Trust Company and others. On exceptions to report of Special Master W. D. Anderson respecting issues between Tishomingo County, Miss., and defendant Trust Company. Exceptions overruled, and decree for defendant.

W. J. Lamb, of Corinth, Miss., for receiver.

Lamb & Warriner, of Corinth, Miss., for Tishomingo County.

Julian C. Wilson, of Memphis, Tenn., for Bank of Commerce & Trust Co.

NILES, District Judge. From the record in this cause it appears that in November, 1911, defendant Bank of Commerce and Trust Company, of Memphis, Tenn., entered into a contract with the board of supervisors of Tishomingo county, Miss., to purchase certain county bonds, of the value of $35,000, issued by said county for building and maintaining roads in supervisor's district No. 1, agreeing to pay therefor par and accrued interest, together with the expense of lithographing said bonds; the total amount to be paid being $35,700.

Defendant, pursuant thereto, issued its check for the agreed purchase price, payable to the order of one W. M. Hundley, treasurer of Tishomingo county, and sent this check to J. H. Faircloth, president of the Tishomingo Banking Company, Iuka, Miss., for deliv-

ery. Faircloth delivered the check to Hundley, the treasurer, who signed the following receipt:

"I, W. M. Hundley, county treasurer of Tishomingo county, Miss., do hereby certify that I have this 15th day of December, 1911, received from the Bank of Commerce and Trust Company, Memphis, Tenn., thirty-five thousand seven hundred dollars ($35,700), the purchase price of $35,000 road bonds of Tishomingo county, supervisor's district No. 1, of the denomination of $500 each, dated August 15, 1911, numbered from 1 to 70, both inclusive, and payable, bonds Nos. 1 to 14, inclusive, respectively, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, and 24 years after date, and bonds Nos. 15 to 70, inclusive, 25 years after date, bearing interest at the rate of 6 per cent. per annum, payable semi-annually on February 15th, and August 15th, being $35,000, the par value of said bonds, and $700, accrued interest on said bonds, to December 15, 1911, the date of delivery of said bonds to the purchaser and payment therefor.

"W. M. Hundley, County Treasurer Tishomingo County, Mississippi."
"Attest: J. H. Faircloth."

Faircloth, after obtaining this receipt and indorsement of the check by Hundley, credited the check on the books of the Tishomingo Banking Company to "Road Fund, District No. 1," and forwarded same to the Bank of Commerce and Trust Company for collection, charging the Bank of Commerce and Trust Company with the amount of the check. The defendant Bank of Commerce and Trust Company thereupon credited the Tishomingo Banking Company on its books with the $35,700 which sum was later checked out, or practically so, by the Tishomingo Banking Company in due course of business.

Soon thereafter the Tishomingo Banking Company was placed in the hands of a receiver, having become insolvent, and the county of Tishomingo is seeking in this suit to recover from the Bank of Commerce and Trust Company the purchase price of these bonds, upon the grounds: (1) That said bonds were invalid; (2) that the bonds had not been legally paid for by the defendant Bank of Commerce and Trust Company.

At the October term, 1913, of this court, Hon. W. D. Anderson was appointed special master to take testimony and report his findings of fact and conclusions of law to the court. The special master afterwards filed his report, recommending that the bill be dismissed, to which report complainant excepts.

The question of the legality of the bonds is eliminated, as upon the trial before the special master complainant abandoned that feature of the bill and conceded the validity of the bonds. The sole question (aside from certain motions by both sides to set aside process, and suppress certain testimony, which is not considered necessary to discuss) is, to quote the special master:

"Whether the bonds involved had been legally paid for by the defendant the Bank of Commerce and Trust Company."

Complainants prefer to state the question thus:

"Did the defendant Bank of Commerce and Trust Company pay the complainant Tishomingo county for the bonds which it bought from the county."

The defendant Bank of Commerce and Trust Company states the issues presented as:

"Whether or not this proceeding amounted to payment by the Bank of Commerce and Trust Company of the purchase price of these bonds, so as to relieve the bank from further liability on their contract of purchase."

Certainly it would be a hardship for Tishomingo county to lose this large amount of money, especially when it was to be devoted to the purpose of improving its roads, which in the court's opinion adds so much to the prosperity and pleasure of a community; but this seems to be the situation:

The county legally issued the bonds, the validity of which is unquestioned. The purchaser issued his check for the purchase price, payable to the county treasurer, taking his receipt therefor. The check was properly indorsed by the treasurer in his official capacity, and the proceeds placed to the credit of "Road Fund, District No. 1," in the Tishomingo Banking Company, of Iuka, where the treasurer kept his official account, and through which bank his business as treasurer was transacted.

The treasurer, in his examination before the special master, on page 51 of the record, testified as follows:

"Q. Where did you keep your money as treasurer? A. In Tishomingo Banking Company.

"Q. That is the only bank in the county? A. Yes, sir; at that time. Yes; I reckon it was during all my term.

"Q. Did they pay your warrants for you? A. Yes, sir.

"Q. Who would make out deposit slips when you deposited money? A. It was done by some one in the bank; don't know whether it was the cashier or not.

"Q. Whichever one was handy would do it? A. Yes, sir.

"Q. You deposited all the county funds you had there? A. Yes.

"Q. How long had you been doing that? A. During the term of four years.

"Q. When you would get checks on different places, what would you do with them? A. Turn them in there.

"Q. Deposit them in there, and have them collect for you? A. Yes, sir; they transacted all my financial matters.

　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊　　＊

"Q. And all checks you had you deposited there, and they would collect them for you; you would indorse the check? A. Yes, sir. ＊ ＊ ＊"

It seems beyond question that in this instance the treasurer indorsed the check, as was his custom, as the Tishomingo Banking Company (which institution was only another name for Faircloth, its presiding genius), as testified by the treasurer, "transacted all my financial matters." It is further clear that the treasurer signed the receipt accompanying the check.

It is admitted that Faircloth acted for defendant in the negotiations leading up to the purchase of the bonds, and it is also a fact that defendant sent its check for the payment of the bonds to Faircloth. The special master finds, under the facts in the case, that, while Faircloth was the agent of defendant in the sale and purchase of these bonds, "the Tishomingo Banking Company acted as the agent of the defendant, to the extent of effecting a delivery of the bonds and making payment therefor, *but it is not true that the agency of the Tishomingo Banking Company extended beyond this.*"

Complainant earnestly contends that the Tishomingo Banking Company was the agent at all times pertaining to this matter of the Bank of Commerce and Trust Company, and because of the defendant having selected the Tishomingo Banking Company as its agent it was the cause of this trouble, and therefore ought to sustain the loss, and

the defendant is estopped because of its acts and conduct in dealing with the Tishomingo Banking Company in disputing this fact, both as a matter of fact and as a matter of law, between it and the complainant in this case.

The court has carefully considered the record herein, realizing that by the unfortunate failure and insolvency of the Tishomingo Banking Company a serious loss will necessarily follow, either to the people of Tishomingo county, or to the defendant, which has parted with its money. It is considered by the court that, aside from the question of agency, the issue here presented is whether such a payment by defendant bank is one that relieves it of further liability on its purchase contract. Was it lawful in the first place for the county treasurer to accept other than coin or other legal tender money of the United States for these bonds?

[1] Commercial usage in the everyday safe and convenient practice of treating checks as money is almost universal, and the legality of such a payment in the instant case is well settled and especially binding upon this court, upon the authority of Montgomery County v. Cochran, 121 Fed. 17, 57 C. C. A. 261. Quoting from the opinion of the court in the authority just cited (Montgomery County v. Cochran):

"Was it the intention of the Legislature that no transactions with the board of revenue and the purchaser of the bonds and the treasurer should be permitted, except by the use of coin or bank bills? The statute must be construed in the light of commercial usage and common knowledge of business transactions. The word 'money,' when used in this statute, does not mean only coin and bank bills. 'Such a construction,' said Lyon, C. J., in State v. McFetridge, 84 Wis. 473, 515, 54 N. W. 1, 10, 998, 20 L. R. A. 223, 'would be extremely technical, and is, we think, uncalled for. "Money" is a generic term, and may mean, not only legal tender coin and currency, but also any other circulating medium, or any instruments or tokens in general use in the commercial world as the representatives of value.' And it was held that a certificate of deposit was money within the meaning of a statute. In Taylor v. Robinson (D. C.) 34 Fed. 681, Judge McCormick said: 'The term "money" is used to designate the whole volume of the medium of exchange recognized by the custom of merchants and the laws of the country, just as the term "land" designates all real estate.' In Allibone v. Ames, 9 S. D. 74, 81, 68 N. W. 165, 167, 33 L. R. A. 585, the court applies this definition to a certificate of deposit: 'When the certificate of deposit was delivered to plaintiff, and accepted by him, it had all the characteristics of money. Its return to the bank must be regarded as a deposit of that amount of currency, It was, the parties so treating it, precisely the same as if the treasurer had received the coin and again deposited it. To say that if a person deposits a draft or certificate of deposit with a bank, and receives credit for the amount of it, he does not make a deposit of that amount, is simply absurd, in view of the modern methods of transacting business.' And there are other authorities to the same effect, showing that the words 'funds or money' and 'proceeds of sale,' as used in the act, should not be confined in their meaning to coin and bank bills. State v. Krug, 12 Wash. 288, 41 Pac. 126; Byrom v. Brandreth, 16 L. R. Eq. Cases, 475; State v. Hill, 47 Neb. 456, 66 N. W. 541; People v. McKinney, 10 Mich. 55; Bork v. People, 16 Hun, 476. The use of checks, certificates of deposit, and other commercial instruments is so universal and so essential in large transactions that we cannot assume that the Legislature of Alabama meant to forbid their use in the negotiation and sale of the bonds. If Josiah Morris & Co. had had the coin on hand to pay for the bonds in question, the transaction would have been conducted by the use of checks or certificates of deposit, and we think without any violation of the terms of the statute. If silver coin had been in bank as the basis of the transaction, its weight (about 6,546 pounds) would have made the use of

checks or certificates necessary to conveniently complete the transaction. We think, therefore, that checks or certificates of deposit received in good faith by the board of revenue, and delivered to the treasurer, or delivered by direction of the board of revenue to the treasurer, would be 'funds or money,' or the 'proceeds of sale' of the bonds, in the hands of the treasurer. The check for the price of the bonds in, the hands of the treasurer, he having re- ceipted for the same as money, was 'funds or money' in his hands, within the meaning of the statute. It was not his duty to keep the check, but to have it cashed, and to keep the coin or notes received on the check. In doing this, he should conform to the law of the state, and keep the coin or notes under his actual personal control, as, for example, in his own safe, or on special deposit. It is conceded to be the settled law in Alabama that, if the check was money in the treasurer's hands, it was a conversion of it to make a general deposit of it in a bank. Alston v. State, 92 Ala. 124, 9 South. 732, 13 L. R. A. 659. If there was reluctance in applying this rule generally to a deposit in a solvent bank, it should be applied without question under the circumstances under which the treasurer deposited this fund. If the check was funds or money, within the meaning of the statute, that would seem conclusive. But if it was necessary that the check be collected before it became money, it is urged with great force that the effect of the deposit of the check to the credit of the treasurer was to collect the check. When the check was presented at the bank and accepted by crediting the amount of it to the treasurer, the effect in law of the transaction was the same as if the amount of the check had been handed to the treasurer and by him returned to the bank. National Bank v. Burkhardt, 100 U. S. 689, 25 L. Ed. 766; City National Bank v. Burns, 68 Ala. 267, 44 Am. Rep. 138; Zane on Banks & Banking, par. 133."

[2] Next will be considered the duty of this treasurer in receiving public money. Sections 352 and 987 of the Annotated Code of Mississippi of 1906 provide:

"Sec. 352. To Issue Receipt Warrants.—It shall be the duty of the county auditor to issue his receipt warrant to any person desiring to pay money into the county treasury, specifying the amount and the particular account on which such payment is to be made, and the fund to which it belongs; but a receipt warrant shall not be credited to the person making such payment, nor be charged to the county treasurer, until they shall be produced and filed with such auditor a duplicate receipt, signed by the treasurer, for the sum specified in such receipt warrant."

"Sec. 987. Money Received on Receipt Warrants Only.—It shall not be lawful for the county treasurer to receive any money except on the receipt warrant of the clerk of the board of supervisors; and when any payment shall be made into the treasury in pursuance of any receipt warrant, the treasurer shall give to the person making payment duplicate receipts, specifying the warrant on which the payment is made, one of which shall be filed with such clerk."

No such receipt warrant was issued in the instant case, and because of the failure to comply with the statute complainant contends that the payment for these bonds was in fact no payment.

Defendant contends that the Code provision quoted requiring the receipt warrant was a statutory method of bookkeeping in the handling of county funds, and is not an essential condition precedent to the vesting of title in the county. The court is of opinion that this contention of defendant is well taken and supported by the authorities, among them Heppe v. Johnson, 73 Cal. 265, 14 Pac. 833; Shanklin v. Madison County, 21 Ohio St. 575. In the case of Heppe v. Johnson, supra, the Supreme Court of California held:

"It is further contended that the treasurer was not authorized to receive the money from the clerk, because it was not accompanied by the certificate of the auditor, as provided in sections 4145 and 4217 of the Political Code. On

the other hand, it is claimed for the respondent that these sections have no application to special deposits made by the clerk of the court of record. However this may be, it is clear that the money was deposited and receipted for as required by the acts of 1864. Bellmer received it without question, and held it during his term of office, and then turned it over to his successor. It was evidently his duty to so turn it over, and we can perceive of no irregularity in the manner of his doing it. Now, if it be conceded that Bellmer received the money irregularly, does it follow that Callahan, after he received it, could embezzle it, without any official responsibility? Suppose Bellmer had received from the tax collector public funds without the certificate and discharge required by the Political Code, and had regularly turned the money over to Callahan, could Callahan have embezzled that money and not be responsible for it on his official bond? We think not. It seems to us that when Callahan received the money in question, whatever irregularities there may have been in making the deposit with Bellmer, he received it in his official capacity, and was bound to pay it out, on the order of the court, or to turn it over to his successor in office." Heppe v. Johnson, 73 Cal. 265, 14 Pac. 833.

We quote from Shanklin v. Madison County, supra, construing a statute of Ohio requiring the issuance of a receipt warrant by the county auditor in order to authorize payment of money into the county treasury:

"The warrant of the county auditor required by statute * * * is not an essential condition precedent to the vesting of title in the county in any case. In devising a system of checks on the treasurer, the Legislature deemed the auditor's warrant an efficient instrumentality for that purpose, by the registry of which in the books of his office the aggregate liability of the treasurer might be shown. * * * It was competent for Putman to have restored in money to the vaults of the treasury the $5,000 embezzled. Can it be seriously insisted that, without the previous warrant of the auditor, the title to the money so refunded would not have vested in the county? We cannot understand why it should not." Shanklin v. Madison County, 21 Ohio St. 575.

Upon the facts as disclosed by this record, there can be no question but that Hundley indorsed the check of defendant for the purchase price of the bonds, and receipted for same, and delivered the check to the president of the bank for deposit to his official credit, as was his invariable custom. This, together with the entries as detailed on the books of the Tishomingo Banking Company and defendant, constitute a legal payment, in spite of the fact that no receipt warrant was issued. That the treasurer was lax in his duty, or was imposed upon under the facts, should not work a hardship on this defendant; nor should he be permitted to impeach his own official acts.

Entertaining these views, the court agrees with the special master that a decree should enter dismissing complainant's bill.